UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 03-CR-10356 MLW

UNITED STATES

v.

FREDERICK SIMONE
A/K/A FREDDY
A/K/A THE NEIGHBOR

AND

VINCENT GIOACCHINI
A/K/A DEE DEE

## ORDER ON DETENTION

ALEXANDER, M.J.

The defendants, Frederick Simone a/k/a Freddy, a/k/a The Neighbor ("Mr.

Simone"), and Vincent Gioacchini, a/k/a Dee Dee ("Mr. Gioacchini"), appeared before

this Court[1] for detention hearings pursuant to an indictment charging Mr. Simone with

violations of 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1951 (Hobbs Act), 18 U.S.C. § 371

(conspiracy), 18 U.S.C. § 1952 (ITAR), 18 U.S.C. § 892 (extortionate extention of

credit), 18 U.S.C. § 894 (collection/extortionate extension), 18 U.S.C. § 1956 (h) (money

---

[1]Francis White was released pending trial on December 22, 2003 under certain conditions
imposed by this Court. Mr. Gioacchini's detention hearing was held on December 9, 2003; Mr.
Simone's detention hearing was held on December 17, 2003.

laundering), 18 U.S.C. § 2 (aiding and abetting), and forfeiture. The government charges

Mr. Gioacchini with violation of 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1951 (Hobbs

Act), 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1952 (ITAR), 18 U.S.C. § 2 (aiding and

abetting) and forfeiture. At their respective detention hearings, the government was

represented by Assistant United States Attorney Colin Owyang. Mr. Simone was

represented by Attorney Kevin J. Reddington and Mr. Gioacchini was represented by

Attorney Robert A. George.

The government moved for detention pursuant to 18 U.S.C. § 3142 (f)(1)(A)(crime

of violence), 18 U.S.C. § (f)(2)(A)(serious risk of flight), and 18 U.S.C. § (f)(2)(B)

(serious risk of obstruction of justice and/or intimidation of witnesses). In support of its

motion, the government presented the credible testimony and affidavit of Detective

Lieutenant John Tutungian of the Massachusetts State Police in support of pretrial

detention (hereinafter, "Tutungian Aff."). The affidavit describes the defendants' alleged

involvement in La Cosa Nostra (LCN), and summarizes information collected while the

defendants were being investigated and surveiled by wiretaps and other means. Detective

Lieutenant Tutungian was thoroughly cross-examined about the affidavit and allegations

therein. Detective Lieutenant Tutungian's affidavit sets forth some ninety paragraphs

(over seventy-five pages) of allegations that read not unlike the story lines from The

2

Sopranos® - as the defendants' themselves evidently recognize.[2]  The allegations set forth, *inter alia*, that the defendants - purported "soldiers" in the LCN - have taken "life-long blood loyalty oaths of omerta" pledging to kill, if necessary, to protect the LCN, *see, e.g.*, Tutungian Aff., ¶ 6; that Mr. Gioacchini and Mr. Simone were involved in the collection of payments ("tribute," "protection" and/or "rent") to the LCN from bookmakers and "loansharks," *see, e.g.*, id. at ¶¶ 14, 15, 32, 42-43, 48-50, 89 via the threat of force; a certain sophistication in avoiding law enforcement by the use of aliases, *see, e.g.*, id. at ¶ 29; and care in not discussing their business over telephones to avert surveillance efforts, *see, e.g.*, id. at ¶ 28; and a solid understanding of potential penalties for crimes. *See, e.g.*, id. at ¶¶ 34- 35.  The affidavit further describes the LCN's purported capacity to assist its members in evading law enforcement, and one another, in furtherance of their enterprises. *See, e.g.*, id. at ¶¶ 37-38.

The defendants are also believed to be violent given their past criminal records and the statements gathered during the investigation. For example, in a conversation recorded on October 28, 2000, Mr. Simone reveals his desire to shoot another alleged underworld figure and his associates "in the head," and dismisses the legal consequences that would follow such an act: "I did fifteen years in prison in my life I'll do another fifteen...You think I care?"  Although defense counsel suggests such statements are in the context of a

---

[2]When Mr. White informed Mr. Simone that he had "a fish in my door step inside the entry way," Mr. Simone responded by stating "that's The Sopranos." *See, e.g.*, id at ¶ 57.

self-defense stance created by internal conflicts within LCN, the statements nevertheless indicate an overt capacity for the ultimate violence (homicide) and a clear disregard for the law and social standards. Indeed, the fifteen year sentence to which Mr. Simone refers to in the excerpt was imposed after his guilty plea on murder charges.

The affidavit is replete with other examples indicating that Mr. Gioacchini also poses a threat to the community. The recording of a conversation on October 21, 2000 reveals Mr. Gioacchini's steadfast resolve to execute the "plan" in order to remove some of the "troubles" he was experiencing. Though such evidence is subject to interpretative and semantic distinctions, in the context of the instant case, it has a certain force -- particularly given that it is but one of an array of allegations indicating a criminal enterprise with clear portents of danger. In fact, Mr. Simone himself was recorded as he discussed Mr. Gioacchini's dangerousness. Here, both defendants are recorded as having made statements interpreted as inculpatory.

In turning to the issue of detention, the Court also has the benefit of reports provided by the Pretrial Services Office regarding each of the defendants' social history.

Pursuant to the Bail Reform Act of 1984, this Court shall detain a criminal defendant pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. . . ." 18 U.S.C. § 3142 (e); United States v. Montalvo-Murillo, 495 U.S. 711, 716-17 (1990).  "With regard to risk of flight as a basis

4

for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's appearance at future court proceedings." United States v. DiGiacomo, 746 F. Supp. 1176, 1180-81 (D. Mass. 1990). The burden of persuasion remains with the government on the question of flight risk. *See* DiGiacomo, 746 F. Supp. at 1181, *citing* United States v. Jessup, 757 F. 2d 378, 381-82 (1st Cir. 1985).

The issue of whether the defendant poses as a danger to the community has a different requirement. The government must prove by clear and convincing evidence that no combination of conditions will reasonably assure the safety of any other person and the community. United States v. Chimurenga, 760 F.2d 400 (2d Cir. 1985). The meaning of clear and convincing evidence does not imply that the judge be "plumb sure" that there is no set of conditions that will protect the public, but the judge should be "pretty sure." United States v. Gray, 651 F. Supp. 432 (W.D. Ark. 1987), *aff'd,* 855 F.2d 858 (8th Cir.), *cert. denied*, 488 U.S. 866 (1988). The Court's independent analysis regarding detention is governed by the rubric set forth in 18 U.S.C. § 3142(g).

First, the Court looks to the nature and circumstances of the offense charged against the defendants. There is evidence present that suggests a violent nature to the alleged criminal activities undertaken by the defendants in this case. Moreover, the crimes with which the defendants are charged constitute the type of offenses courts often find to be violent, serious, and indicative of a risk of flight. This Court finds that the

5

alleged offenses must be taken seriously. Furthermore, the affidavit provides evidence
that these defendants, both of whom have prior felony convictions, were in possession of
firearms. *See* 18 U.S.C. § 922(g). Although not charged with that offense here, the Court
notes such conduct demonstrates a great risk of violence as well as an overt disregard for
the law.

Second, the Court looks to the weight of the evidence against the defendants. In
that an indictment is extant, probable cause is established by the indictment and the Court
need not engage in further probable cause analysis. <u>United States v. Vargas</u>, 804 F.2d
157, 162-63 (1st Cir. 1986).

The Court's third inquiry relates to the individual defendants. The Court
addresses each of them *seriatim*.

Mr. Simone has an extensive criminal record which includes convictions for armed
robbery, possession of a firearm and conspiracy to commit murder. As noted previously,
the affidavit provides information derived from wiretaps indicating a continuing callous
disregard for human life and the legal consequences of criminal acts such as murder. Mr.
Simone thus portends clear danger based on his past and recent behavior.

Mr. Simone has lived in Massachusetts all his life and currently resides here. He
has four sisters who live in Massachusetts and four adult children, three of whom
currently reside in the District. The defendant has been unemployed for approximately
one year. There is no suggestion before the Court that Mr. Simone has any medical,

6

mental health or substance abuse issues.

There is some dispute over Mr. Gioacchini's criminal record. The government, for purpose of detention, stipulated to a somewhat benign portion of the record. But as with Mr. Simone, the affidavit provided by Detective Lieutenant Tutungian sets forth conduct that concerns the Court as it assesses this defendant's character and propensity of violence. For example, in the recording mentioned in the affidavit, Mr. Gioacchini makes statements such as "If you're looking to hurt me, I'm going to kill you." Furthermore, while conversing with Mr. Simone, Mr. Gioacchini states "Now I'll quit f---ing work and I'll devote my time to the f---ing street and I'll annihilate everybody."

Mr. Gioacchini is a lifelong resident of Massachusetts. His wife and a daughter reside within the District. For the previous eight years, Mr. Gioacchini has been employed. There is no suggestion before the Court that Mr. Gioacchini has any significant medical, mental health, or substance abuse issues.

Finally, the Court has also looked to the nature and seriousness of the danger to any person or the community that would be posed by the release of these two defendants. The Court concludes such a danger is extant. The affidavit describes conversations between the defendants, including those recorded on November 4, 2000, in which they discuss their knowledge of where certain people reside and their ability to reach them if necessary. Mr. Simone makes threatening remarks to Mr. Gioacchini regarding third parties, including "competitors" within the organized crime arena. The Court believes the

7

defendants pose a threat to the community if released pending trial.

In light of the foregoing, and in consideration of the penalties the defendants face if convicted, the Court finds by a preponderance of the evidence that the defendants, despite their ties to the community, pose a significant risk of flight and have the means to flee, and the Court further concludes that the flight risk cannot be contained by any condition or combination of conditions. And although alleged membership in an organized crime enterprise is not dispositive on the issue of detention, it is a factor considered. United States v. DiGiacomo, 746 F. Supp. 1176, 1182 (D. Mass. 1990). The Court also finds by clear and convincing evidence that there are no conditions of release which could assure the safety of the community if they were released pending trial.

Based on these findings and the factors outlined above, this Court ORDERS that the defendants FREDERICK SIMONE, A/K/A FREDDY, A/K/A THE NEIGHBOR, and VINCENT GIOACCHINI, A/K/A DEE DEE, be detained pending trial.

Further, pursuant to 18 U.S.C. §3142 (i) it is ORDERED that:

1.    The Defendants be, and hereby are, committed to the Custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2.    The Defendants be afforded reasonable opportunity for private consultation with their counselors; and

3.    On Order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the Defendants are confined shall deliver the Defendants to an authorized Deputy

8

United States Marshal for the purpose of any appearance in connection with a court proceeding.

Review of this Detention Order may be obtained by Defendants' filing of a motion for revocation or amendment of the Order pursuant to 18 U.S.C. § 3145 (b).

SO ORDERED.

January 16, 2004                          United States Magistrate Judge

9