UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO. 03-CR-10356-MLW

UNITED STATES

VS.

FREDERICK A. SIMONE,
a/k/a FREDDY, a/k/a
THE NEIGHBOR,

VINCENT C. GIOCCHINI,
a/k/a DEE DEE; and

FRANCIS WHITE, a/k/a
THE WHITE-HAIRED GUY

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO SUPPRESS PHYSICAL EVIDENCE NO. 2
# DERIVED FROM ELECTRONIC SURVEILLANCE WITH WARRANT
# (Wiretap)

On September 1, 2000 Trooper Pasquale Russolillo of the Massachusetts State Police submitted an affidavit in support of an application seeking electronic interception over a telephone line (hard line) subscribed by defendant, Simone, as well as a cell phone and renewal applications were filed and allowed on September 19, October 4, October 19, October 24, November 10 and November 22, 2000.

A review of the initial affidavit submitted on September 1, 2000 by Russolillo reveals that he avers that he has probable cause to believe that Simone and other named individuals were involved in a number of named designated offenses including extortion, gaming and loan sharking. The affiant bases his request on information provided by Robert Luisi, Jr. and six informants. The information is woefully deficient and does not rise to the level of probable cause.

Pasquale Russolillo in his affidavit states, inter alia;

¶1- Sets forth his experience as a state police investigator.

¶2- Sets forth his opinion of the structure of illegal gaming operations. He notes that it is hierarchical with multiple levels and describes the duties of each level as it relates to the overall business of gambling.

¶3- He notes that during his career as well as through "conversations" with Lt. Tutungian that many of the so-called investigative procedures used by law enforcement officers generally do not work. He

describes the use of the telephone and its relationship with the book making operation. These are all generalizations and he does not set forth any case specific observations.

He discussed the time frame of 1995-1998 and notes that many individuals in the "Patriaca Crime Family" were incarcerated. He relates information he obtained from Robert Luisi, Jr. regarding his efforts to form an alliance with Philadelphia and notes that he became a "soldier" in the Philadelphia group. Luisi indicated that it was to his benefit to insure that divisiveness and confusion disrupted any organized crime in New England. Luisi tried to gain control of the New England LCN business.

Luisi stated that he knew from conversations with John "Jackie" Salemme that Freddie Simone was to be elevated to "Capo regional" in the New England LCN upon his release from prison in 1998.[1]

Luisi admitted that he "did not like" Simone although he frequently talked to him on the telephone. Luisi would "talk" to Simone about various illegal activities on his cell phone and home phone. Luisi said they spoke in "coded" language. Russolillo goes on to state that Simone was known as "Swifty" because he did a lot of walking/talking to avoid electronic and physical surveillance.[2] Luisi described Franny White as being a "loan shark" without any specifics. He noted that he took over the collection of "rent" from Mr. White from the Salemmes.

"Sometime in 1998" Luisi needed money and met with Simone and White at a restaurant in the North End. He borrowed $50,000 from White at 1% interest per week. Eventually he stopped paying. Luisi indicated that he was not going to pay White. He told the affiant that Simone and White issued loans together and shared the "juice" payments. He made many unsubstantiated statements about Simone and White without any indication as to the basis of his comments.[3]

When asked about his obvious stiffing of White for the loan, Luisi said, "Thanks Freddie" when he learned that some of the money was his. He was showing Simone that he, Luisi, was in control of the "neighborhood." Many wild, entertaining and wholly unsubstantiated statements about Simone were

---

[1] The affiant relates many wild and unsubstantiated statements about the structure of the New England "LCN family" without any statement as to the basis of the opinion.
[2] He notes that his supervisor encountered similar activity in 1991.
[3] For example, Luisi stated that "Simone is definitely his (White's) guy. Rusallilo then says that this means that White earns money for Simone through loan sharking, for example." (p. 21).

related to the affiant by Luisi, White and one John DeMarco. He also referred to Chris "The Greek" Kotsiopolous and Vincent Roberto.[4]

He relates that an Essex County wiretap corroborates the information from Luisi in that intercepted conversations and surveillance show that Anthony Musto delivered "rent payments" from Roberto and Kotsiopolous to Simone. Luisi stated that Simone and Giochini were "dealing drugs" in the North End and that Simone finances Joe "The Rat" Rascato to deal Percocets.[5]

## The Essex Investigation

For three months the "special services section" conducted a gaming investigation. It was related that one of the organizations was headed by Vincent Roberto. The other was headed by Christopher Kotsiopolous. Russolillo described the Essex wiretap and its investigation. He does not relates any specifics and notes that no arrests were made although he states that he listened to "hundreds" of telephone calls recorded during the Essex investigation.

He describes the evidence obtained during the investigation on the "Roberto organization" (p. 25). He describes telephone conversations that were intercepted between Roberto and a man in Florida. He notes that search warrants were executed by the Broward County Sheriff's office and many records and gaming materials were seized along with pertinent documents. The defendant, Simone's telephone number was listed in one of these documents.[6]

Russolillo then describes Roberto's gambling career based on what Lt. Tutungian told him. He details his prior criminal record with attention to gambling convictions (some of these matters go back over 20 years). He then turns his sights on Kotsiopolous and opines that he is a gambling organizer as well. He is known as "The Greek" among other aliases. Russolillo then describes a third "gaming organization" known as the "Zampanti Organization." Again, this historical discussion makes for interesting reading but

---

[4] He also talked about Michael Dezotell, Cono Frizzi, Jr. and Billy Lenardi.
[5] As is the case with virtually all of Luisi's statements there is no corroboration nor is there any specific fact set forth in any detail to show the basis of his knowledge of these interesting but wholly unsubstantiated statements.
[6] See Motion for Franks hearing. Roberto was apparently not charged nor did he forfeit any property. A $30,000.00 fine was apparently paid.

is totally devoid of any specifics and all of the information has nothing to do with Simone directly or indirectly.[7]

Russolillo notes, however, that during one call intercepted during the Essex investigation Musto described Simone as "everybody's boss." (refer also to Luisi's observation that Simone is a "busybody.") Luisi stated, however, that he and Gioacchini collected rent from Zampanti. Russolillo stated that he learned through calls intercepted in the Essex investigation that Roberto runs a realty business in Brighton, Massachusetts. Anthony Musto was observed entering the business locus on a number of occasions. A search warrant was executed at this location. Among documents seized were telephone bills that revealed 38 telephone calls made from this locus to Simone's telephone. Russolillo states that a number of telephone conversations that were intercepted between Roberto and Musto commented on Simone's collection of "rent" from Roberto, Musto and Kotsiopolous. Simone is referred to as "the neighbor."

Russolillo details various phone calls that were intercepted and uses broad editorial license to speculate on their meaning generally putting a nefarious spin on otherwise innocuous conversations. (p.33-34).[8] Many of these conversations are referenced in support of Russolillo's "opinion" that Simone was being paid "rent" (p.34-35).

Russolillo tries to corroborate Luisi by referring to "CI-1" who told Tutungian that Mike Dezotell is a bookmaker "who pays rent to Simone." (There is no basis for the source of this information from this informant).

There are many more cryptic, if not innocuous telephone conversations related by Russolillo. One constant theme in all of these calls is the total lack of any real or apparent threat, collection or criminal conduct; it is only Russolillo's "opinion" that turns these conversations into purported criminal activity. The bottom line is that none of the calls referred to that were derived from the Essex investigation reveal any criminal activity on the part of the defendant.

---

[7] He notes that "no calls intercepted during the Essex wiretap were determined to have mentioned an instance in which Simone extorted rent from members of the Zampanti organization. (p.30).
[8] E.g., he suggests that "272" refers to the defendant's telephone exchange. A conversation betweenMusto and Roberto where Roberto says "See if you…see uh what…collect at 272, we need it bad" does not apparently mean to collect money from "272" i.e. the defendant but rather that incredibly Roberto instructs Musto to pay the defendant.

**Confidential Informants**

In an effort to bolster the shallow "evidence" obtained, the affiant refers to some "information" he, Tutungian and Trooper Scanlon have received from confidential informants that show that Simone is "systematically extorting rent from bookmakers." He refers to six informants. The affiant knows of them (3,4,5 and 6), Scanlon and Tutungian "know" 1 and 2 respectively.

**Confidential Informant No. 1**

Tutungian has known this individual for ten years. He has been involved as a bookmaker and talks regularly to Tutungian on the telephone. In the past, this individual has provided Tutungian with undescribed and undetailed information pertaining to bookmaking operations over 100 times. His information has led to the arrest of 10 unnamed individuals with seizure of apparatus.

In April of 2000 this informant told Tutungian that Simone approached unnamed bookmakers on unknown occasions and threatened to "disrupt" their business unless they paid him "rent." According to the informant Simone told a named bookmaker's associates (unnamed) that if he wanted to continue he would have to pay "rent." According to the "unnamed associate" Tepecaw, the Bookie has paid rent.[9] The informant also told Tutungian that since his release from prison Simone extorted money from another named bookmaker.

Russolillo confirms only that his person is, in fact, a bookmaker. Russolillo says that the informant told him that Roberto identifies bookmakers to Simone so he can extort "rent." Stretching the rumor and innuendo without <u>any</u> corroboration let alone statement as to the basis of knowledge, he states that "CI-1 learned from <u>an associate</u> that Roberto and Simone in the past three months attempted to extort rent from a <u>particular bookmaker</u>."

---

[9] Again, there is no indication of the basis of the knowledge of this totem pole hearsay.

**Confidential Informant No. 2**

Trooper Scanlon has known this informant for five years. This informant has provided unspecified information to the state police that was not set forth nor was it the basis of an arrest or conviction. There is virtually no evidence of credibility to this individual. This informant said that he was to pay "rent" to Simone in an unspecified time. He said that three other unnamed bookmakers told him that Simone demanded "rent" from them. This informant states that Simone has been paid rent by other named bookmakers without any reference to specifics. Another uncorroborated assertion of payment of rent to Simone by one Marquardo was referred to. Again, the informant made flat, conclusory statements regarding this "rent" payment without any basis in fact. Further, once again, there was no corroboration.

**Confidential Informant No. 3**

This individual was known for seven years by the affiant Russolillo. He is an admitted bookmaker for 15 years. There is again literally no attempt to show credibility or reliability of this individual. Again, flat, conclusory statements of a hearsay nature are related to the affiant that Simone demanded payment of rent by this individual's supervisory bookmaker.

The informant also alleges that he heard from another unidentified "associate" that Simone demands and receives "rent" from Donato Fratarolli who owns a North End restaurant. He also claims that he "heard" that Simone demands back rent from "other bookmakers" for the time he was in prison. Simone gave the informant his cell phone number.

**Confidential Informant No. 4**

Russolillo knows this individual for one year. The only reference to credibility is the provision of a telephone number that was a target of the Essex investigation. He also provided the name of Roberto's wife and the location of his business. Once again, the same old, tired, uncorroborated, conclusory

statement is attributed to this "informant." Simone is "extorting rent" from "various bookmakers" including Roberto, Kostiopolous and Dezotell.

**Confidential Informant No. 5**

Russolillo knew this individual for two years. Prior reliability is totally non-existent. This person alleges that he has information that Francis White is "associated with organized crime." White is allegedly involved in "loan sharking." A feeble attempt at corroboration of this totally irrelevant statement is attempted by the affiant when he notes that intercepted conversations reveal that White and "the neighbor" went out last night and the night before." This informant then states that a loan from White required over 50% per annum. He would pay this directly to White. He relates that he (CI-5) knows of "several others" who have borrowed money from White at "very high interest rates."

**Confidential Informant No. 6**

Tutungian has known this person for five months. There is no evidence of reliability. Only one statement regarding this informant is related. Simone supposedly demanded "rent" over the telephone at an unknown time. He continues to pay Simone.

An attempt was made to corroborate these informants. Reference was made to "information obtained from the FBI." Russolillo describes the FBI investigation of Simone and the use of a pen register on his (now disconnected) telephone. From December 17, 1998 to October, 19999 a pen register was utilized on this phone by the FBI. These records were recovered by Russolillo in June of 2000.

Russolillo recounts "information" given by "Source 1, Source 2 and so on." The only effort to show past reliability is the statement that "FBI Special Agent Carroll assured me that the sources' names and addresses are known to the FBI and they had proven reliable in past FBI investigation." He then states that a review of the FBI files reveal that the FBI information corroborates Luisi. Inter alia, he notes that;

-On May 6, 1999 Source 2 advised that Ruggerio and 20 men" were going to take over "rents" in southeastern Massachusetts.

-Simone met with Ruggerio on May 13, 1998. Later he met with Simone and White at a pastry shop.

Source 5 said that Dezotell and Roberto were "coordinating" rent payments to Simone by "certain bookmakers." Simone threatened a bookmaker and discussed "illegal gambling" with Dezotell.

Many such references are made to information provided by these "sources." None of them have any indicia of credibility or reliability and all constitute nothing but double and sometimes triple hearsay that is nothing more than rumor and innuendo.

White's association with the "mafia" is then discussed. Russolillo relates to the FBI files and "intelligence" to discuss matters such as an intercepted telephone conversation in 1996 where "a speaker" referred to a "person with white hair" who was involved in loan sharking and bookmaking activities. Incredibly, Russolillo then says that "it was the collective opinion of the officers conducting that investigation that the person in question was Francis White…." Further statements by Russolillo show the shallow quality of the investigation. For example, he notes that during surveillance White and Simone have been seen with DeMarco. The affidavit then relates conclusory statements from CI-2 and CI-3 that they have "heard from other bookmakers" including CI-3's apparent boss that John DeMarco is "assisting" Simone in the extortion of rent. Again, no factual basis of this statement is given nor is a time, place, manner or means let alone <u>any</u> indicia of reliability.

Russolillo then states that Source 9 says that White and Simone are "major powers" in the "Boston rackets." Additional ramblings are set forth detailing the conclusory statements from these "sources."[10]

**Surveillance Information**

The affiant details the surveillance conducted by Special Services Section of the State Police as well as the FBI. The surveillance referred to basically reveals nothing other than Simone meeting on occasion with White and DeMarco. They also have been observed associating with other individuals who are "known organized crime members and associates." The affiant does set forth the FBI surveillance that "corroborated the <u>prolonged illegal activity</u> by Simone and his associates. For example, on September 1, 1998 FBI agents observed…. Giocchini, Simone and White enter Franny White's vehicle on Hanover Street and leave the area.[11] After recounting several instances of perfectly

---

[10] Attempts at corroboration are weak at best. E.g., telephone number for White found in documents seixed in the Essex investigation.
[11] That is it! This is apparently indicative of criminal activity!

<u>normal, legal activity</u> the affiant incredibly states that this information corroborates their opinion that "Simone is involved in illegal extortion and gaming activities with specific known members of organized crime."[12]

**Toll Analysis**

Finally, the affiant details the results of a toll analysis done on Simone's telephones and others. The analysis is recounted in detail. Nowhere in the affidavit is there one shred of evidence that shows <u>any</u> illegal activity by Simone other than his association with various individuals and the use of the telephone. The affiant further sets forth pen register results that again show calls to various individuals with no discernable pattern of relevance or illegality.

The conclusion of the affidavit has the affiant stating that he believes that this information reveals that Simone and others are involved in an illegal conspiracy to extort and loan shark. He notes that normal investigative techniques may have resulted in the gathering of sufficient evidence. He apparently feels that such a course of action would not result in the apprehension and successful prosecution of all the participants in the illegal organization.[13]

**ARGUMENT**

Due to the intrusive nature of electronic surveillance, wiretapping is to be "the exception and not the rule." **United States vs. Hoffman**, 832 F.2d 1299 (1st Cir. 1987). Federal law establishes the minimum standard governing the issuance of a warrant authorizing interceptions of oral telephonic communications. Title III of the Omnibus

---

[12] Nowhere in the affidavit does Rusallilo tell the magistrate why any named individual is, in fact, a member of "organized crime" with any factual basis or detail. Again, all flat conclusory perjorative statements.

Crime Control And Safe Streets Act, 18 U.S.C. §2510 et. seq. This statute requires issuance of judicially sanctioned warrants for electronic surveillance in a limited number of occasions in strict compliance with the statute. **United States vs. Giordano**, 416 U.S. 505 (1976), **United States vs. Gotti**, 42 F.Supp. 20, 252 (SD NY 1999). The electronic interception in this case was violative of Title III and all evidence obtained therefrom should be suppressed.

## I. THE AFFIDAVIT DID NOT PRESENT SUFFICIENT PROBABLE CAUSE DUE TO THE LACK OF ANY CREDIBLE AND BELIEVABLE INFORMATION AS TO THE BASIS OF KNOWLEDGE AND RELIABILITY OF SOURCE

When Russolillo presented the affidavit on September 1, 2000 he relied on information provided by Robert Luisi, Jr. and six confidential informants. Under §2518(1)(b) the application must include "a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued."

The application must address four specific elements; 1.) The offense being investigated; 2.) Facilities at place where the interception is to occur; 3.) Type of communications to be intercepted and; 4.) Identity of persons to be overheard. **United States vs. Armocida**, 515 F.2d 49 (3rd Cir. 1978), **United States vs. Errera**, 616 F.Supp. 1145 (D. MD. 1988).

If insufficient facts are presented and they do not constitute probable cause then the warrant cannot be issued. **United States vs. Bernstein**, 509 F.2d 996 (4th Cir. 1975). The appropriate standard under §2518 (1)(b) is that of probability, the same as that

---

[13] He notes that he and Tutungian "continue to receive information from informants set forth in the affidavit." Refer to Motion for Franks hearing.

standard that governs issuance of a search warrant. The standard is that as set forth in **Illinois vs. Gates**, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed2 527 (1983). This standard applies the totality of the circumstances test to the ultimate evaluation of the information presented in the affidavit.

Information from informants should not be credited unless the affidavit presents to the issuing magistrate the "facts and circumstances under the informant's conclusions." **United States vs. Garcia**, 785 F.2d 214 (8th Cir. 1986). A fair consideration of the Russolillo affidavit shows that virtually <u>none</u> of the information provided by the informants is anything but rumor.

Judicial wiretap orders must be preceded by applications containing prescribed information. §2518(1). The judge must make certain findings before authorizing interceptions including the existence of probable cause. §2518(3), **United States vs. Giordano**, 416 U.S. 505, 40 L.Ed2 341, 94 S.Ct. 1820 (1974), **United States vs. Cole**, 807 F.2d 262 (1986).

The standard of review of an application is to "test it in a practical and common sense manner" to determine whether the facts which it sets forth are "minimally adequate" to support the findings made by the issuing judge. **United States vs. Cole**, supra, **United States vs. Smith**, 726 F.2d 852 (1st Cir. 1984) quoting **United States vs. Southard**, 700 F.2d 1 (1st Cir. 1983) and **United States vs. Scibelli**, 549 F.2d 222 (1st Cir. 1977).

The inquiry must be whether or not the affidavit provides sufficient basis for the finding or probable cause. **United States vs. Santana**, 342 F.3d 60 (2004). Probable

cause exists when the affidavit demonstrates in some trustworthy fashion that an offense has been or is being committed.  **United States vs. Vigeant**, 176 F.3d 565 (1st Cir. 1999).

II. **THE AFFIDAVIT DID NOT MEET THE THRESHOLD STANDARD REQUIRED TO JUSTIFY THE USE OF ELECTRONIC SURVEILLANCE AS THERE WAS INSUFFICIENT SHOWING THAT THERE WAS A NECESSITY TO THE USE OF SUCH INTRUSIVE TECHNIQUES BECAUSE NORMAL INVESTIGATIVE TOOLS WERE USED AND WERE INADEQUATE OR TOO DANGEROUS TO IMPLEMENT**

Russolillo in his affidavit basically repeats the statutory language as it relates to necessity and the failure of normal investigative tools in the investigation.  The affidavit does not set forth with any specificity any of the facts that illustrate the good faith attempt made to utilize normal investigative techniques.

In **United States vs. Villarman-Oviedo**, 325 F.3d 1 (2003) the Court held that the requirement that the government provide the magistrate with a full and complete statement as to whether or not other investigative procedures have been tried and failed or are reasonably unlikely to succeed if tried or may be too dangerous.  Title III §2518(1)(c) has been interpreted in this Circuit as meaning that the statement must demonstrate that the government has made a good faith effort to run the gamut of normal procedures before resorting to means so intrusive as electronic surveillance.  See also **United States vs. Hoffman,** 832 F.2d 1299 (1st Cir. 1987).

The affidavit must at least demonstrate that the effort in good faith has been made to utilize the normal techniques.  **United States vs. London**, 66 F.3d 1227 (1st Cir. 1995).  In this case, the government has not shown that alternative techniques, in this case, wiretaps, would fail to expose the crime.  C.f. **United States vs. Ashley**, 876 F.2d 1069 (1st Cir. 1989), **United States vs. Santana**, 342 F.3d 60 (2004).

In **United States vs. O'Malley**, 764 F.2d 38 (1st Cir. 1985) the Court held that installation of wiretap devices that were extended and further expanded by the placement of an "oral interception device" in a place of business was constitutionally appropriate where the affidavit truly indicated the attempt to employ normal investigative techniques. The affidavit in that case illustrates the detail that is required in showing the efforts that were used by law enforcement. The difficulties encountered were detailed along with the previously unsuccessful attempts made to obtain evidence by conventional means. It also outlined the attempts at covert surveillance, undercover agents and the issue of violence. Each application and affidavit had specific facts addressing each requested warrant and were not a mere rehash of the older affidavit as is presented here.

In **O'Malley**, the Court noted that in **United States vs. Santora**, 583 F.2d 453 (9th Cir) (vacated on other grounds), 441 U.S. 939 (1979) that the court ordered suppression of evidence obtained where the government failed to show that normal investigative techniques would have been unlikely to uncover the activities of other alleged co-conspirators whose telephones were tapped under the earlier wiretap order.

        Frederick Simone
        By his attorney

        /s/Kevin J. Reddington"

        Francis White,
        By his attorney

        /s/ Richard M. Egbert, Esq.

        Vincent C. Giocchini,

By his attorney

/s/ Robert George, Esq.