UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                    Criminal No. 03-CR-10356-MLW

FRANCIS WHITE,
FREDERICK SIMONE and
VINCENT GIOACHINNI

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF AMENDED MOTION FOR *FRANKS* HEARING AND MOTION TO COMPEL DISCLOSURE OF INFORMANT STATUS OF PURPORTED TARGETS

Defendants Frederick Simone, Francis White and Vincent Gioacchini submit this

supplemental memorandum of law in support of their Amended Motion for Franks Hearing and

Motion to Compel Disclosure of Informant Status of Purported Targets, as requested by this

Court in open court on October 12, 2004.  This Memorandum is specifically designed to address,

*inter alia,*[1] two questions raised by this Court at the October 12, 2004 hearing:

> (A) Whether the standard set forth in <u>United States v. Giordano</u>,
> 416 U.S. 505 (1974), controls the remedy of suppression sought by
> Defendants, or whether the heightened standard under <u>Franks v.
> Delaware</u>, 438 U.S. 154 (1978), controls;[2] and
>
> (B) Which of Trooper Russolillo's specific allegations are false
> and misleading?

[1]     To avoid confusion and for efficiency, Defendants herein also address the arguments raised in their prior submission.

[2]     Defendants believe that, no matter which standard this Court deems appropriate, Defendants have more than met their burden of proving suppression is mandated

1

## I.     **INTRODUCTION**

By way of the instant motion, Defendants raise the disturbing question of whether affiant Trooper Russolillo made intentional and material misrepresentations about the role of two purported targets – Vincent Roberto and Michael Dezotell – in each of the underlying warrant applications.  In short, Defendants have demonstrated good cause to believe that Russolillo purposefully failed to tell Massachusetts State Judge Botsford that Roberto and Dezotell were not actually targets of the wiretap and bugging investigations, but instead, were informants.

Such misleading tactics can lead to only one result:  suppression.  As one legal scholar (and current United States District Court Judge) remarked long ago,  "[i]f the degree of an informant's actual involvement is obscured so that a misleading impression is created, the statement of inadequacy of alternatives will be found insufficient, thereby invalidating the surveillance application."  J. Carr, *The Law of Electronic Surveillance*, p. 4-60 (1988).  And, eleven years later, this very Court had the occasion to rule upon affidavits containing such misleading impressions; the result was suppression.  See United States v. Salemme, 91 F.Supp. 141 (D.Mass. 1999), rev'd on other grounds, United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000).

As set forth below, the instant case presents circumstances similar to those contemplated by Judge Carr, as well as to those presented in the Salemme case.  Should Defendants' suspicions turn out to be well-founded, this Court will not doubt conclude that suppression is the appropriate remedy here as well.[3]

---

[3]     As this Court recognized in Salemme, suppression in cases such as the one at bar may derive from one of two sources:  Title III itself (as interpreted by Giordano), or under Franks. See 91 F.Supp.2d at 353; 359-363.  Each theory of suppression is discussed herein.

## II.    <u>OVERVIEW OF WIRETAP LAW</u>

Before discussing the specific allegations at issue, an overview of the law pertaining to wiretaps bears discussion.

"By its very nature eavesdropping involves an intrusion on privacy that is broad in scope [and] indiscriminate use of such devices raises grave constitutional questions under the Fourth and Fifth Amendments, and imposes a heavier responsibility on this Court in its supervision of the fairness of the procedures…." <u>Berger v. New York</u>, 388 U.S. 41, 56 (1967)(citation and internal quotation marks omitted). In light of this vast intrusion, neither statutory nor constitutional law permit the issuance of wiretap warrants in ordinary investigations. Instead, the government may obtain a warrant for electronic surveillance only in an appropriate -- *i.e.*, rare -- case. <u>See</u> <u>United States v. Hoffman</u>, 832 F.2d 1299, 1307 (1st Cir. 1987)("in a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception and not the rule.")

Federal law sets the standard for the issuance of warrants authorizing such interceptions. Specifically, Title III of the Omnibus Crime Control and Safe Streets Act, codified at 18 U.S.C. § 2510, <u>et</u> <u>seq</u>., generally prohibits the use of electronic surveillance. This investigative tool is permissible only under Title III's expressly delineated exceptions, and even then, only upon judicial approval. <u>See</u> <u>Giordano</u>, 416 U.S. at 514. Failure to abide by Title III's terms can lead to suppression. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>infra</u>. (discussing suppression under <u>Giordano</u>).

In sum, an affiant seeking a wiretap warrant must establish (1) probable cause to believe an individual is committing a designated offense; (2) probable cause to believe that the communications to be intercepted are being made in connection with such offense; and (3) that

normal investigative procedures have failed or appear unlikely to succeed (the "necessity requirement").  See 18 U.S.C. § 2518(3); M.G.L.c. 272 § 99E.  It is the latter that is at issue here.

## A.     THE NECESSITY REQUIRMENT

The necessity provision is designed to "safeguard against the use of wiretapping as an initial step in the investigative process."  United States v. Mora, 623 F.Supp. 354, 361 (D.Mass. 1985), aff'd, 821 F. 2d 860 (1st Cir. 1987).  The police may not resort to wiretapping if "traditional investigative techniques would suffice to expose the crime."  United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974).  Instead, they are "required to make a reasonable, good faith effort to run the gamut of normal investigative procedures…."  United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989)(citation omitted).   To that end, "an affidavit offered in support of a wiretap warrant must provide some basis for concluding that less intrusive investigative procedures are not feasible."  United States v. Lilla, 699 F.2d 99, 103 (2d Cir. 1983).

Furthermore, the necessity requirement is one of constitutional magnitude.  As this Court explained, "[t]he showing of necessity…is constitutionally compelled because requiring the government to persuade a court that conventional methods of investigation are not likely to succeed or are too dangerous require a showing of a form of the 'exigent circumstances' that must be made to render a search 'reasonable' in the absence of the pre-search notice that is ordinarily required by the Fourth Amendment,' but is imposed as a matter of constitutional law."  Salemme, 91 F.Supp.2d at 365.

Because the wiretaps at issue in the instant case were authorized under Massachusetts state law, an examination and comparison of state and federal law is required.

## B.    THE NECESSITY REQUIREMENT UNDER FEDERAL LAW

Title III's necessity provision mandates that an affiant seeking a wiretap warrant provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  Put another way, "the government *must explain fully* in its application what investigative techniques have been tried against the target of the wiretap." United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir.), cert. den., 522 U.S. 962 (1997) (emphasis added); see also United States v. Lilla, 699 F.2d 99, 193 (2d Cir. 1983) (affiant has the *unqualified* obligation to make a full and complete statement regarding necessity.)

The failure to include the requisite full and complete statement is, in a word, fatal.  To be sure, without such compliance, Judge Botsford had absolutely no way of making an independent determination as to whether the necessity requirement has in fact been met.  See id. And, of course, evidence obtained in violation of the necessity requirement must be suppressed.  See United States v. Castillo-Garcia, 117 F.3d 1179, 1185 (10th Cir. 1997).

## C.  THE NECESSITY REQUIREMENT UNDER MASSACHUSETTS LAW

The Massachusetts wiretap statute is codified at 272 M.G.L. § 99 ("Section 99" or "§ 99").  Like Title III, § 99 proscribes the warrantless interception of oral and wire communications except in explicit statutory circumstances (none of which are relevant here). See id.  And, like Title III, § 99 contains a necessity provision.   Specifically, § 99E3 provides: "A warrant may issue only upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried."

Comparing Title III's necessity requirement with that of § 99E3 reveals what appears, at first glance, to be a fundamental difference:  Unlike Title III, § 99E3 does not expressly mandate

5

that an affiant make a "full and complete statement" concerning necessity.  The difference in statutory language, however, is of no consequence:  the Massachusetts Supreme Judicial Court has held that the  "full and complete" language must be read into § 99E3.  See Commonwealth v. Vitello, 367 Mass. 224, 247 (1975).

## III.    RELEVANT FACTS

In or around 2000, the Special Services section of the Massachusetts State Police began in investigation focusing on Simone and his alleged involvement in illegal gaming activities. During their investigation, the Massachusetts State Police -- greatly assisted by federal agents[4] -- submitted seven applications[5] for electronic surveillance warrants to Massachusetts Superior Court Judge Margot Botsford.

The first application for a warrant (authorizing wiretaps on Mr. Simone's home and cellular telephones) was submitted on September 1, 2000.  Russolillo -- who authored each supporting affidavit -- submitted renewal applications for the wiretaps on Mr. Simone's telephones on September 19, October 4, October 19,[6] October 24, November 10, and November 22, 2000.

---

[4]      The prosecution cannot credibly dispute that this was, in essence, a joint federal/state investigation.  See e.g. Exh. A at pp. 49-54 (Russolillo acknowledges having utilized fruits of FBI investigation, including the use of FBI informants and an FBI pen register; Russolillo further acknowledges discussing the FBI informants with FBI Special Agent Carroll; pp. 56-7 (discussing information received from FBI source); pp. 61-62 (discussing FBI surveillance of targets'); pp. 74-78 (discussing results of FBI pen register).

[5]      Defendants previously submitted copies of each affidavit to this Court.  References to each herein will be made by the date of each affidavit.

[6]      On October 19, the State Police expanded the scope of their investigation to include a bug inside Mr. Simone's home.

6

A.    **The Targets**

The initial targets of the wiretap were Simone, White, John Demarco, and Vincent Roberto.  9/1/00 Aff.  at p. 78.  Russolillo alleged there was probable cause to believe that Simone, White, Demarco, and Roberto were part of an on-going conspiracy to commit crimes relating to Massachusetts gaming, usury and extortion statutes.  See id.  Eventually, the list of targets to include each of the foregoing, as well as Michael Dezotell, Joseph Salvati, Robert Nardolillo, Adolfo Bruno, Matthew Gugliemetti, Joseph Rosato, and Anthony Musto, each of whom allegedly conspired with the original targets to commit similar offenses.

Throughout his affidavit dated September 1, 2000, Trooper Russolillo went to great lengths to convince Judge Botsford that: (a) Roberto was a heavy player in the illegal gaming organization he was investigating; (b) that Roberto had close ties with Mr. Simone; and (c) that investigators were seeking to gather evidence to be used against Roberto in a later criminal prosecution.  See 9/1/00 Aff.[7]  In subsequent affidavits, Russolillo did the same, as to both Roberto and Dezotell.

Specifically, Russolillo alleged that "[c]onversations intercepted during [an earlier] investigation revealed that Roberto supervised a large-scale illegal gaming operation that employed several agents and clerks and generated lucrative profits."  9/1/00 Aff. at p. 27.  According to Russolillo, Roberto has been involved "in illegal organized gaming" since 1990 or 1991.  Id.  Russolillo goes on to describe various telephone calls, wherein Roberto discussed his own gaming organization.  Moreover, Russolillo attached to his affidavit transcripts from six calls in which Roberto was intercepted during an earlier wiretap investigation.  See attachments to 9/1/00 Aff.

---

[7]    As discussed *infra*, however, those allegations were, at best, misleading.

Russolillo further alleged (on page 22), that Roberto was "with" Simone, and that he pays rent to Simone directly.  In seeking to tie Roberto's illegal activities to Simone, Russolillo averred:

> Conversations intercepted during this investigation revealed that Frederick Simone currently controls two (2) interconnected gaming organizations through the systematic extortion of "rent" payments from the individuals who control these bookmaking organizations.  One organization is headed by Vincent Roberto and is referred to in this affidavit as the "Roberto Gaming Organization.

Id. at p. 24.  To that end, Russolillo further alleged that in March 2000, the Broward County Sheriff's Office in Florida executed a warranted Roberto's Pompano Beach residence.  During that search, investigators found numerous gaming records, including "references to Frederick Simone…" uncovered in the search of Roberto's residence." Id. at p. 27.[8]

Michael Dezotell became a named target of the wiretap investigation on September 19, 2000.[9] See 9/19/00 Aff.  Beginning with the application submitted on that date, Russolillo began to rely heavily upon conversations between Dezotell and Simone to substantiate his requests to continue the wiretapping of Simone's home and cellular telephones.

For example, on pp. 10-11 of the September 19th affidavit, Russolillo alleged:

> At approximately 1352, on Friday, September 8, 2000, Simone received a call from Michael Dezotell.  As noted in my first affidavit dated September 1, 2000, Dezotell is a bookmaker in the Greater Boston Area who pays rent to Simone…

---

[8]     See Affidavit of Patricia A. DeJuneas Regarding False and Misleading Allegations for additional examples of how Russolillo consistently tried to convince Judge Botsford that Vincent Roberto was truly a target of the wiretap investigation.

[9]     Russolillo first made reference to Dezotell in his September 1st affidavit.  Dezotell, however, was not named a target at that time.

Based upon my experience in wiretap investigations, it is my opinion that during this conversation, Dezotell was giving Simone an excuse for being late on his "rent" payment. Specifically, Dezotell was trying to get additional time in which to pay his monthly "rent" due to Simone, by claiming to have left his house without Simone's cell or home phone number.

During this call, Simone referred to the term "Tomatoes," which is presently believed to be a restaurant called "Gone Tomatoes." Though Simone specifically states "that fuckin clown, Tomatoes, did you see him," I immediately recognized the shortened name "Tomatoes," as that of a restaurant located on the Cape from conversations with Lieutenant Tutungian and Trooper Scanlan. Lieutenant Tutungian and Trooper Scanlan have been receiving confidential information regarding the owners William and Marc Petralia of the restaurant on Cape Cod, called "Gone Tomatoes" and their connection to Michael Dezotell including placing bets through Dezotell's office….

On pp. 15-16 of the same affidavit, Russolillo references a telephone conversation between Simone and Dezotell, opining that "…Simone is clearly upset with Dezotell for not meeting him as promised on Friday, September 8, 2000. Dezotell explains to Simone that the traffic coming up from the Cape delayed him..." During that same conversation, Russolillo alleges that Dezotell agreed to bring "Nobska Red" wine and "that shit" from "Tomatoes" with him at a meeting at 11:00 a.m. on September 13, 2000. Russolillo then alleged:

Through physical surveillance, Dezotell was observed [on September 13, 2000] from the time he left his house located at 16 Cricklewood Drive, Stoneham, Massachusetts, until he met with Simone at Simone's residence in Framingham. Surveillance officers observed Dezotell meeting with Simone in his driveway and observed the two men entering Simone's residence. Despite references to "Nobska Red" and wine, Dezotell did not carry any items in his hands to the meeting. In addition, Troopers were able to look inside Dezotell's vehicle through the windows while it was parked at a hospital en route to the meeting with Simone. No bottles, wine or other items other than some hanging clothes were observed in the vehicle. As a result of the physical surveillance conducted on September 13, 2000, it is the opinion of Lieutenant Tutungian and myself based upon our training and experience that the references to "Nobska Red" (a local Cape Cod

9

wine), together with references to "the wine" and "that shit" are
cryptic references to payment made from the owners of "Gone
Tomatoes" to Simone.

On page 17 of the same affidavit, Russolillo cites another Dezotell/Simone call which,

according to Russolillo:

> …indicates there is current tension between Vincent Roberto and
> Dezotell.  In addition, this conversation reveals that Dezotell is
> attempting to create tension between Simone and Roberto by
> spreading rumors that Simone does not like Roberto.  During the
> September 12, 2000 conversation, Simone is upset at Dezotell for
> starting rumors that he hates Roberto and orders Dezotell to stop
> telling people that he hates Roberto and to stop the rumors about any
> animosity between them.  Roberto, it will be recalled from information
> set forth in my affidavit dated September 1, 2000, is a bookmaker who
> pays "rent" to Simone and who informs Simone of the existence of
> other bookmakers.

And, in each subsequent affidavit, Russolillo consistently made allegations seeking to

convince Judge Botsford that Roberto and Dezotell were actual targets.  See for example:

- 10/4/00 Affidavit at pp. 3-4; 46-47 (alleging probable cause to believe

  that Roberto Dezotell and others were committing the designated

  offenses);

- 10/4/00 Affidavit at p. 7 (alleging that Roberto and Dezotell were

  paying rent to Simone);

- 10/4/00 Affidavit at pp. 18-21 (referencing intercepted call between

  Simone and Dezotell and alleging it to be proof that Dezotell was

  making arrangements to make payment of rent to Simone);

- 10/4/00 Affidavit at pp. 23-37 (referencing intercepted calls between

  Dezotell and Simone and alleging them to be proof that threats were

  being made against Dezotell in connection with illegal gaming

10

activities);

- 10/4/00 Affidavit at p. 39 (alleging "that Simone has interceded or intends to intercede in a dispute between Joseph Salvati, Michael Dezotell and others, representing another faction of organized crime who are attempting to collect illegal gaming or 'rent' money"); also (alleging that "Simone collects rent and/or loan interested payments from bookmaker Michael Dezotell…");

- 10/4/00 Affidavit at p. 40 (alleging Simone uses his home to meet and discuss illegal activities with Roberto, Dezotell and others);

- 10/19/00 Affidavit at p. 8 (alleging that Simone used his home to discuss illegal activities with Roberto and Dezotell and others);

- 10/19/00 Affidavit at pp. 9-10 (alleging that Dezotell is a bookmaker "who meets frequently with Simone to make rent payments to him");

- 10/19/00 Affidavit at p. 10 (alleging that Dezotell has been intercepted calling Simone to "discuss 'rent' and/or loan payments that [Dezotell] collected from the owner of a restaurant…called "Gone Tomatoes" and agreeing to meet [at Simone's home] for the purpose of delivering 'rent' payments to Simone and further discussing their extortion, gaming and loansharking activities."); see also pp. 11-13 (alleging similar conversations and activities);

- 10/19/00 Affidavit at pp. 13-14 (alleging that Dezotell was being threatened by a "competing faction of organized crime" and that Simone told Dezotell that Roberto was responsible for the threats

against Dezotell);

- 10/19/00 Affidavit at pp. 33-34 (alleging that Roberto pays rent to Simone; also repeating "with" Simone and repeating allegations about search of Roberto's Florida home);

- 10/19/00 Affidavit at pp. 34-35 (discussing intercepted calls between Roberto and Simone wherein they allegedly discuss meetings at Simone's home and payment of rent);

- 10/24/00 Affidavit at pp. 5-6; 10-11; 32-34 (alleging probable cause to believe Roberto, Dezotell and others were committing designated offenses);

- 10/24/00 Affidavit at p. 12 (alleging Simone used his home to conduct meetings with Roberto, Dezotell and others to discuss designated offenses);

- 10/24/00 Affidavit at p. 25 (alleging that Dezotell -- described as an "individual[] associated with Simone" -- was receiving threats from "organized crime faction");

- 10/24/00 Affidavit at p. 27 (alleging that Simone threatened Roberto with a gun because he believed Roberto was responsible for threats against Dezotell and others);

- 11/10/00 Affidavit at p. 12 (alleging that Simone uses his home to meet with Roberto, Dezotell and others about "their extortion, gaming and loansharking criminal usury activities");

- 11/10/00 Affidavit at p. 25 (allegations regarding threats against

12

Dezotell and that Simone was using his home to discuss what to do about them);

- 11/10/00 Affidavit at pp. 27-28 (alleging that Roberto visited Simone's home and Simone threatened him with a gun and threatened others as well);

- 11/22/00 Affidavit at pp. 8-9; 26-27 (alleging probable cause to believe Roberto and Dezotell, among others, were committing designated offenses);

- 11/22/00 at p. 11-12 (alleging that Simone used his home to conduct conversations about designated offenses with Roberto and Dezotell, among others);

- 11/22/00 Affidavit at pp. 16-17 (alleging that Simone and Dezotell discussed threats).

**B.     Alleged Goals of Wiretap Investigation**

As of the goals of the investigation, Russolillo alleged:

A primary goal of this investigation is to penetrate the gaming, criminal usury and extortion conspiracy or conspiracies described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of the persons involved in <u>all</u> levels of the conspiracy, including, but not limited to Frederick Simone, Francis White, John Demarco and Vincent Roberto and to dismantle the organization(s) in which they work.  Other goals include: (1) identifying and prosecuting the gaming organization members who constitute Simone's targets; (2) identifying the individuals who are victims of Simone's criminal usury and extortion; (3) identifying and prosecuting the gaming, criminal usury and extortion organization members whom Simone pays in order to operate; (4) discovering where the proceeds of Simone's extortion, criminal usury and gaming operations have been spent, stored or invested, and seizing and

seeking forfeiture of those proceeds pursuant to M.G.L. ch.
276, § 7 (5) determining the manner in which the persons in
these organization and/or conspiracies conduct their business
and; (6) the location(s) used by the organization to store their
records.

### C.    Allegations of Necessity

Of course, Russolillo's affidavit also addressed the necessity requirement.  He claimed

familiarity with the necessity requirement, averring that "[d]uring my police career and through

conversations with Lieutenant Tutungian, I have become familiar with, and have utilized, many

of the so-called normal investigative procedures used by law enforcement officers…."  (9/1/00

Aff. at p. 5)

In his September 1st affidavit, as to whether he and his fellow investigators satisfied the

necessity requirement, Russolillo alleged:

> In my opinion, normal investigative procedures have been tried
> and have failed to generate sufficient evidence to identify,
> apprehend and successfully prosecute all members of Frederick
> Simone's extortion and gaming organization; to expose the full
> scope of the gaming, criminal usury and extortion activities of
> Simone and the other organization members; to reveal where the
> proceeds of Simone's extortion, criminal usury and gaming
> activities have been spent, stored, or invested; and to dismantle
> permanently the criminal activities of the organization members.
> Continued exclusive reliance on normal investigative procedures
> likewise will almost certainly prove futile.  As such, we believe
> that the best available means of identifying, apprehending and
> prosecuting all the members of this organization, and to achieve all
> of the goals of this investigation, is the use of court authorized
> electronic monitoring.

9/1/00 Affidavit at p. 79.

As to the use of informants, Russolillo alleged:

> Although Lieutenant Tutungian and I continue to receive
> information from several of the informants discussed earlier in this

14

> affidavit, these informants are unable to penetrate sufficiently far into the organization to enable law enforcement to achieve the goals of this investigation using only normal investigative procedures. Moreover, these confidential informants have provided cooperation and assistance to law enforcement on the conditions that their identities remain concealed and they not be compelled to offer testimony against Frederick Simone or his associates. I continue to believe that attempts to have the informants further penetrate this organization as law enforcement agents would place them at substantial risk of being discovered and placing them at substantial risk of being threatened or harmed.

Id. at p. 80.

As to whether investigators had access to others with first-hand knowledge of the targets' alleged criminal activities, Russolillo alleged:

> I continue to know of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures. Without the corroboration of electronic surveillance, even the testimony of the named cooperating individual, Robert Luisi, Jr., discussed in this affidavit, will be viewed in light of the circumstances surrounding this cooperation and his antagonistic relationship with Simone.

Id. at pp. 80-81.

As to whether law enforcement could obtain the cooperation of any of Mr. Simone's alleged associates, Russolillo alleged:

> It is also my opinion that attempting to persuade Frederick Simone or any of his associates to cooperate, or inviting any of them to testify before a grand jury, would be futile and would jeopardize the objectives of this investigation. If any of these persons refused to cooperate, he or she would likely alert the other members of the organization to the existence of this investigation, making it much more difficult, if not impossible, to identify, apprehend and prosecute all the members of Simone's illegal organization.

Id. at pp. 81-82.

Finally, in seeking to explain why physical surveillance was not feasible, Russolillo

15

complained:

> Although police officers assigned to this investigation continue to
> conduct periodic physical surveillance of Frederick Simone and his
> associates, it remains my opinion that conducting prolonged or
> extensive surveillance, and/or trash analysis, poses an unacceptable
> risk that surveillance officers will be detected.  I continue to believe
> that physical surveillance unaccompanied by electronic surveillance
> will not enable law enforcement to achieve the goals of this
> investigation.

Id. at p. 82.

Russolillo's allegations as to necessity in each successive affidavit are, in essence, a

mirror image of those in his September 1st affidavit.  See 9/19/00 Aff. at pp. 20-24; 10/4/00 Aff.

at pp. 47-51; 10/18/00 Aff. at pp. 46-51; 10/24/00 Aff. at pp. 34-38; 11/10/00 Aff. at pp. 37-42;

11/22/00 Aff. at pp. 28-33.

## V.    FALSE STATEMENTS, MISREPRESENTATIONS AND OMISSIONS

As set forth below, Rusolillo's affidavits redound with false and misleading allegations

about the true status of Roberto and/or Dezotell, and about necessity.

### A.    Misrepresentations and Omissions Regarding Purported "Targets" Vincent Roberto and Michael Dezotell

As set forth below, Defendants have more than ample reasons to believe that neither

Roberto nor Dezotell were actual targets:  instead, they were informants whom investigators had

absolutely no intention of prosecuting.

#### 1.    Defendants Have Made A Substantial Showing that Vincent Roberto Was Not a Target, but an Informant.

As to Roberto, Defendants have good cause to believe that he was an informant working

with the police before or during the pendency of the wiretap warrants.  In support, Defendants

previously submitted the affidavit of Pamela Harris-Daley.  Ms. Harris-Daley asserted, under

16

oath, that a short time after the wiretap warrants were first authorized, Miriam Roberto( Vincent

Roberto's wife) told Ms. Harris-Daley that Roberto "was a rat." Mrs. Roberto also told Ms.

Harris-Daley that she believed her husband was an informant because, in their Florida home,

Vincent Roberto had introduced several men as "FBI" as well as "his friends."

Moreover, as set forth in the Supplemental Affidavit of Patricia A. DeJuneas,[10] upon

information and belief, federal authorities, assisted by the Massachusetts State Police, arrested

Vincent Roberto in the State of Florida during the summer of 2000. At that time, enforcement

authorities sought to seize much of Roberto's property, and government agents threatened to

press charges against Roberto's wife and daughter; and that the Florida prosecution was resolved

to Roberto's favor in that he paid a $30,000 fine, the government abandoned its forfeiture

requests and the government did not prosecute his family members. See id.

Much of that information has been corroborated. To be sure, Russolillo acknowledged

on several occasions that Roberto spent substantial time in Florida, where he conducted illegal

gaming activities. Most importantly, however, Trooper Russolillo alleged that "the Organized

Criminal Activity Section of the Broward County Sheriff's Office had become involved in

investigating Roberto's gaming activities, and that the Sheriff's office obtained court-authorized

pen-register and trap and trace devices on Roberto's Florida telephone." Id. Furthermore, he

alleged that on March 24, 2000, the Broward County Sheriff's Office executed a search warrant

at Roberto's Florida home, and that the search revealed evidence of illegal gaming activity; a

search of Roberto's Massachusetts business was conducted that same day. Notably, however,

Russolillo did not allege - nor, upon information and belief, could he have truthfully done so --

that Roberto was ever criminally charged in connection with that search. See id.

---

[10]    This Affidavit is submitted herewith as a separate document.

**2.  Defendants Have Made a Substantial Showing that Michael
Dezotell Was Not a Target, but an Informant.**

In her affidavit, Ms. Harris-Daley also averred under oath that, during the summer of

2000, Dezotell admitted that he had provided information to federal law enforcement officers.

As Ms. Harris-Daley explained, she was at a restaurant dining with Dezotell and several others.

Dezotell had been drinking heavily that night.  As he grew more intoxicated, the owner of the

restaurant expressed his concern that Dezotell not drive home.  In response, Dezotell declared,

"What do I care?  I'm with the FBI."

Russolillo himself unknowingly corroborated Ms. Harris-Daley's allegations.

Specifically, in his affidavit dated September 19, 2000 (at p. 33), Trooper Russolillo alleged the

following:

> We note according to the records of the Attorney General's office,
> Michael Dezotell was named in a wiretap investigation conducted by
> the Massachusetts State Police, Special Services Section, from
> October to December, 1993.  The Orders and Warrants for this
> investigation were issued by Superior Court Justice Thomas E.
> Connolly on October 25, 1993, November 8, 1993 and December 3,
> 1993…  *As set forth in a letter to Justice Margot Botsford, dated
> September 19, 2000, from these applicants and incorporated herein
> for reference, Michael Dezotell was not charged as a result of this
> investigation.*

(emphasis added).[11]  The obvious inference is that the letter explains that Dezotell was not being

prosecuted in exchange for his cooperation and information he was providing to law

enforcement.

**B.    The Allegations of Necessity Are False and/or Misleading.**

If Roberto and/or Dezotell were in fact informants, then several aspects of Russolillo's

---

[11]    The state prosecutors refused to disclose this letter to Mr. Simone in his state court case.
Defendants have requested the document through the United States Attorney's office, but are
awaiting a response as of this time.

necessity allegations are false, including:

- Russolillo's claim that the "informants are unable to penetrate sufficiently far into the organization to enable law enforcement to achieve the goals of this investigation using only "normal investigative procedures;"

- Russolillo's allegation that he "know[s] of no person willing to assist law enforcement in this investigation who has sufficient first-hand information to bring about the achievement of the goals of this investigation based exclusively on normal investigative procedures;"

- Russolillo's allegation that "attempting to persuade Frederick Simone or any of his associates to cooperate;" and

- Russolillo's allegations that physical surveillance -- unaccompanied by electronic surveillance – would be futile.

These allegations are misleading, if not out-right false, for one simple reason: if as Defendants suspect, Roberto and Dezotell were not targets, but instead, informants, investigators had invaluable -- and so-called "normal" – investigative techniques readily at hand. To be sure, according to Russolillo's affidavits, both Roberto and Dezotell were heavily involved in the gaming organization under investigation. Russolillo also alleged that both had close ties to Simone, the primary target; in fact, Russolillo acknowledged that both had been to Simone's home on numerous occasions.

As such, by gaining their cooperation, investigators could have accomplished the goals of the investigation without resorting to the most invasive investigative tool available. Specifically, Robert and/or Dezotell could have (1) identified the other members of the organization; (2) identified the alleged victims of the organization; (3) identified those who worked form Simone; (4) explained the structure and manner in which the organization was operated; and (5) pointed

19

investigators to the location of records, funds, and the like.

Finally, Russolillo omitted any mention whatsoever as to the true roles Robert and/or

Dezotell played in the investigation.

## VI.    MOTION FOR DISCLOSURE

As set forth in their prior submission, Defendants have respectfully requested that this

Court issue an order requiring the prosecution to disclose[12] whether purported targets Vincent

Roberto and/or Michel Dezotell were not targets, but instead, informants.  Defendants further see

an order requiring the prosecution to disclose each and every promise, inducement and reward

extended to Roberto and/or Dezotell during the relevant time period.

A nearly identical request was made – and granted -- in United States v. Salemme, 978

F.Supp. 343, 345-46 (D.Mass. 1997).  In that case, this Court held that the government was

required to disclose such information, because, if true, it was exculpatory and relevant to

evidentiary hearings such as the one requested here.  As in the 1997 Salemme case, Defendants

here have "provided specific reason to believe that [purported targets] were cooperating with the

FBI during the relevant time period."  Id. at 350.

Disclosure of the requested information is absolutely essential to a fair determination on

Defendants' motions.  Moreover, if Defendants' suspicions are true, any protections normally

offered to the government where informants are concerned[13] is substantially outweighed:  no law

---

[12]    If this Court so chooses, it may conduct an *in camera* proceeding to assess the validity of
Defendants' claims.  Should this Court proceed with that option, it should record all ex parte
proceedings.  See, e.g., United States v. Southard, 700 F.2d 1, 11 (1st Cir. 1983).

[13]    The Supreme Court has held that "where the disclosure of the informer's identity or of
the contents of his communication is relevant and helpful to the offense of an accused, [the
governmental privilege to withhold such information] must give way."  United States v. Roviaro,
353 U.S. 53, 60-61 (1957).

enforcement officer should be permitted to commit such an outright and blatant fraud upon this, or any Court, especially when seeking judicial approval to use such highly invasive means of investigation.[14]

Here, upon disclosure, Defendants anticipate that this Court will see with striking clarity that the wiretap warrants at issue were unjustifiably issued because Russolillo failed to meet even the most basic aspects of the necessity requirement.  Just the opposite, in fact:  he intentionally (or at least recklessly) subverted its requirements and in so doing, committed a fraud upon the Massachusetts Superior Court.

## VII.    <u>MOTION TO SUPPRESS</u>

Title III expressly mandates suppression whenever "the communication was unlawfully intercepted…"  <u>See</u> 28 U.S.C. § 2518 (10)(a)(i).  Importantly, this provision does not state -- expressly or otherwise -- that an affiant's state of mind is in any way relevant to whether the remedy of suppression is required.  And case law makes clear that state of mind is irrelevant.  In <u>Giordano</u>, the United States Supreme Court held that:

> Congress intended to require suppression where there is a failure to satisfy any of [the Title III] statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

416 U.S. at 527.  Put another way, as this Court explained, "[i]f a central provision of Title III is ignored or otherwise violated, suppression must be ordered unless the government provides that

---

[14]     Moreover, disclosure is required under our Local Rules.  Specifically L.R. 116.2 (A)(2) requires the prosecution to disclose, *inter alia*, exculpatory evidence that will "[c]ast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress…which would, if allowed, be appeasable pursuant to 18 U.S.C. § 3731…."

the purpose which the particular procedure was designed to accomplish has been satisfied in spite of the error…" Salemme, 91 F.Supp.2d at 359.

There can be no real dispute whether Giordano applies here. Undoubtedly, the necessity requirement codified at 18 U.S.C. § 2518(1)(c), is "a central provision of Title III because it directly and substantially implements the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." Salemme, 91 F.Supp.2d at 353, citing Giordano, 416 U.S. at 527 (internal quotation marks omitted).

And, once Defendants' well-founded suspicions are confirmed, this Court will undoubtedly find that Russolillo "fail[ed] to make the legally required full and complete statement concerning necessity and the statutory purpose of that requirement was not…achieved…" Id. In such a case, suppression is mandated, without having to go through the Franks analysis. See id.

## VIII.    MOTION FOR *FRANKS* HEARING

As is true with ordinary search warrants, affiants seeking wiretap warrants have a duty of candor. And, although an affidavit offered in support of a wiretap warrant application ordinarily carries a presumption of validity, that presumption may be overcome. See e.g. Salemme, 91 F.Supp. 2d 141.

To do so here, Defendants must first make a substantial preliminary showing that the affidavit contains deliberately false statements, statements made with a reckless disregard of their truth, or technically accurate statements that have been rendered misleading by omission. This first prong, however, does not require Defendants to meet the preponderance standard. See, e.g., United States v. Mares-Martinez, 240 F.Supp.2d 803, 821 (N.D. Ill.) Moreover, "[w]here

22

the defendant asserts that the particular facts are as he represents them,…those facts will be assumed to be true unless controverted by the government." J. Carr, 6:31, 6-72 (Jan. 2004) citing United States v. Tufaro, 593 F.Supp. 476, 485 (S.D.N.Y. 1983) aff'd 762 F.2d 991 (2d Cir. 1985).

Second, Defendants must show that the challenged statements were material to a finding of necessity. See United States v. Grant, 218 F.3d 72, 77 (1st Cir.), cert. denied, 531 U.S. 1025 (2000).

### A.     The Affidavits Are Riddled with False Statements and Omissions Regarding Necessity

The misrepresentations, false statements and omissions are described supra. At pp. 16-20.

### B.     Defendants Have Met Their Burden of Showing that Russolillo Acted Intentionally or at Least Recklessly

The decision as to what information was "necessary to establish the necessary foundation" for a wiretap warrant absolutely does not belong to the affiant. "The district judge, not the agents, must determine whether the command of Congress has been obeyed." United States v. Spagnulo, 549 F.2d 705, 710 (9th Cir. 1977).   Affiants do not have the authority to determine which pieces to pick and choose in making its statement. Indeed, "the government is not permitted to disclose only the information that it wishes to rely upon.  Rather, the government is obligated to inform the court of all of the relevant information that the agencies participating in the investigation possess concerning necessity." United States v. Mastroianni, 749 F.2d 900, 908 (1st Cir. 1984).

As to whether Russolillo deliberately and recklessly violated these principles here, this Court should note Russolillo took great care to make it appear that Roberto and Dezotell ware

targets.  Further, this Court should note Russolillo's vast experience not just as a police officer,

but also his experience in wiretap investigations.  To be sure, he was the affiant in each affidavit

submitted during the so-called Essex Wiretap Investigation, to which Russolillo extensively

referred in seeking to establish probable cause to obtain the wiretaps presently at issue.  And in

those Essex Wiretaps, Russolillo's allegations of necessity are virtually identical to those he

made in the seven affidavits at issue here.  See Aff. of Patricia DeJuneas Regarding False and

Misleading Allegations.

Finally, this Court should note the nature of the misrepresentations and omissions:  each

was clearly critical to not just the necessity requirement, but also probable cause.  See e.g. United

States v. Rivera, 928 F.2d 592, 604 (2d Cir. 1991) (Recklessness may be inferred where the

omitted information was 'clearly critical' to the probable cause determination.")

### C.    The Misrepresentations and Omissions Were Material.

The touchstone of materiality is whether, had she known the true facts, the issuing judge

would have questioned whether the necessity requirement had been met.  United States v.

Salemme, 978 F.Supp. 343 is illustrative of the materiality inquiry this Court must now make.

The Salemme law enforcement affiants swore that "the only reasonably likely method of

gathering competent evidence of these offenses is through the requested intercept."  The

defendants moved for a Franks hearing, asserting that the affiants failed to disclose that its

"confidential" informants were, in fact, named in the application as purported targets of the

electronic surveillance (i.e., James J. "Whitey" Bulger and Stephen J. Flemmi).  See id. at 347-

48.  To satisfy the first prong of Franks, the defendants offered evidence that Bulger, Flemmi and

others had been cooperating with the FBI, and that their cooperation was not revealed to the

judge who authorized the warrant.  Id. at 347.  The Salemme defendants also showed that

Flemmi's FBI control agents had at least tacitly authorized his participation in illegal gambling.

See id.

> Finding the requisite materiality, this Court reasoned:

>> [K]nowledge that the FBI had tacitly approved Flemmi's participation in illegal gambling would, arguably, have caused a reasonable judge to have denied the 1984 and 1985 requests for electronic surveillance that was purportedly intended, in meaningful measure, to obtain evidence of Flemmi's gambling activity.

>> Moreover, if the fact that Flemmi was providing information about the criminal activity of others had been disclosed in the applications, a reasonable judge would arguably have asked for additional testimony and/or documentary evidence to determine whether Flemmi voluntarily, or if immunized and compelled to testify…, would provide some of the evidence regarding other targets that the government repeatedly represented electronic surveillance was essential to obtaining.

>> The possibility that a judge would have refused to authorize the requested electronic surveillance would have plainly been increased if Bulger was also then an informant and the judge had been so informed.

> Thus, the Court held, the defendants were entitled to a Franks hearing.  See id.

There is no reason to treat the instant case differently.  To be sure, not only did the misrepresentations amount to a fraud on the Massachusetts Superior Court, but knowledge that investigators had, in some instances, tacitly approved Roberto and/or Dezotell's criminal conduct undermines any need to monitor communications to which they were parties.  Indeed, if either Roberto or Dezotell were cooperating, the State Police could have avoided the "necessity" of wiretapping simply by wiring their cooperating witnesses and recording their conversations with Defendants or other targets.  See, e.g., Commonwealth v. Penta, 32 Mass.App.Ct. 36, rev. denied, 412 Mass. 1103 (1992)(holding that secret recording of informant and defendant was not

an interception protected by wiretap statutes); <u>Commonwealth v. Davis</u>, 407 Mass. 1001 (1990)(same).

Moreover, it is entirely possible, if not probable, that Dezotell's many conversation with Defendants were scripted by the government. Surely a conversation at the behest of a government agent is not nearly as credible as one in which targets were unaware that the police were listening.

In short, this Court should not "tolerate the willful or reckless submission of misleading or incomplete information in support of an application to conduct electronic surveillance. The government will not have met its burden of justifying this intrusive technique, unless its agents have been candid…" <u>In re Application for Interception of Wire Communications</u>, 2 F.Supp.2d 177, 179 (D.Mass. 1998).

In light of the nature of the misleading information contained in Russolillo's affidavits here, this Court can reach only one conclusion: that if Russolillo revealed the relevant and material information that Roberto and/or Dezotell were not actually targets of the investigation but, government informants, Judge Botsford would not have authorized the wiretaps.

IX.    <u>CONCLUSION</u>

Wherefore, Defendants respectfully request that this Court:

1.    Issue an order requiring the prosecution to disclose whether purported targets Vincent Roberto and Michael Dezotell were in fact informants, as well as each promise, inducement and reward extended to each;

2.    Issue an order suppressing the fruits of each wiretap and bugging warrant because law enforcement recklessly and/or intentionally failed to comply with the wiretap statutes; or, in the alternative;

3.    An evidentiary hearing concerning misstatements, omissions and misrepresentations as to material aspects of affidavits offered in support of several applications for wiretap and bugging warrants.

FRANCIS WHITE,
By his attorneys,


  /s/ Patricia A. DeJuneas
Richard M. Egbert, BBO #151800
Patricia A. DeJuneas, BBO # 652997
99 Summer Street, Suite 1800
Boston, MA 02110
617.737.8222


## CERTIFICATE OF SERVICE

I, Patricia A. DeJuneas, hereby certify that I have caused a copy of the foregoing document to be served on Assistant United States Attorney Ernest DiNisco by first class mail, this 22nd day of October, 2004.


  /s/ Patricia A. DeJuneas
Patricia A. DeJuneas