UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
        v.                  )   CR. NO.   03-CR-10356-MLW
                            )
FREDERICK A. SIMONE (1),    )
  A/K/A FREDDY, THE NEIGHBOR, and  )
VINCENT C. GIOACCHINI (2),  )
  A/K/A DEE DEE,            )
                            )
        Defendants.         )

### GOVERNMENT'S CONSOLIDATED OPPOSITION
### TO DEFENDANTS' MOTIONS TO SUPPRESS (I-III)
### AND REQUEST FOR FRANKS HEARING

The United States of America, by its attorneys, Michael J.
Sullivan, United States Attorney, and Assistant U.S. Attorneys
Ernest S. DiNisco and Heidi E. Brieger, hereby files the following
Consolidated Opposition to Defendant FREDERICK SIMONE's ("SIMONE")
and Defendant VINCENT GIOACCHINI's ("GIOACCHINI") (collectively,
the "Defendants") Amended Motion To Suppress and For A Franks
Hearing, and To Compel Disclosure Of Informant Status Of Purported
Targets ("Defendants' Motion").  As grounds for its Consolidated
Opposition, the government states that the Defendants have failed
to raise a valid claim:  (1) that there was insufficient probable
cause for the issuance of the wiretap warrants; (2) that any of the
wiretap warrants were issued in violation of the statutory
necessity requirement; (3) that the information in the affidavit
for the search warrant of SIMONE's home was stale and insufficient
to establish probable cause; and (4) that they have made the
requisite showing entitling them to a hearing pursuant to Franks v.

Delaware, 438 U.S. 154 (1978). Accordingly, for the reasons set forth below, the Defendants' Motion should be denied, in its entirety, without a hearing.

## I.   BACKGROUND

### A.   Introduction.

From September 1, 2000, through December 7, 2000, Massachusetts Superior Court Associate Justice Margot Botsford issued Orders and Warrants authorizing the interception of electronic communications for two telephones (cellular and residential) subscribed to by SIMONE (hereinafter, the "Botsford Orders"), pursuant to M.G.L.A. Ch. 272, §99, et seq.[1] The main focus of this investigation, and the Orders and Warrants in particular, was the alleged criminal activities of SIMONE, defendant FRANCIS WHITE, John DeMarco and Vincent Roberto. As the wiretaps continued and were renewed, the Orders and Warrants identified additional targets, including defendant GIOACCHINI. In addition, from October 19, 2000, through December 7, 2000, Judge Botsford issued Orders and Warrants authorizing the interception of oral communications inside SIMONE's residence at 32 Lowther Road, Framingham, Massachusetts.

At the conclusion of the wiretap investigation, the Massachusetts State Police ("MSP") obtained state court-authorized

---

[1]M.G.L.A. Ch. 272, §99 authorizes electronic surveillance for a period of 15 days. The wiretapping orders were subsequently renewed on September 19, October 4, 19, and 24, and November 10 and 22, 2000.

2

search warrants for, among other things, SIMONE's person, vehicle, and residence. During the search of SIMONE's home on December 7, 2000, MSP troopers seized a .32 caliber Savage Arms semi-automatic pistol ("Savage") loaded with eight (8) rounds of ammunition.[2] Both the Massachusetts Department of Public Safety and the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives reported that the Savage was untraceable. In January 2001, GIOACCHINI and SIMONE were indicted on state weapons violations. Each has been assigned a January 2005 trial date in state court: GIOACCHINI on January 10, 2005, and SIMONE on January 24, 2005.

On November 20, 2003, a federal grand jury returned a 39-count indictment charging SIMONE, GIOACCHINI, and WHITE with violating the RICO statute, based upon a pattern of 34 racketeering acts and the collection of unlawful debts. The indictment also charged SIMONE, GIOACCHINI, and WHITE with interstate travel in aid of racketeering, Hobbs Act extortion, and making and collecting extortionate extensions of credit. SIMONE was also charged with money laundering. In addition, the indictment seeks forfeiture from SIMONE, GIOACCHINI, and WHITE of assets in the amount of more than $950,000.

On September 20, 2004, the Defendants filed joint motions to suppress the evidence derived from the state-authorized wiretaps

---

[2]Law enforcement agents seized firearms from GIOACCHINI and WHITE during court-authorized searches of their persons and residences on the same date.

3

and the search of SIMONE's home pursuant to warrants.[3]  On October 21, 2004, defendants filed an Amended Motion to Suppress and for a Franks Hearing.

## B.   The  Orders  And  Warrants  Authorizing  Electronic Surveillance.

### 1.   September 1, 2000

On September 1, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the interception of wire communications occurring over 508/272-0298 (cellular telephone) and 508/788-1035, both subscribed to by FRED SIMONE, 32 Lowther Road, Framingham, Massachusetts.  The Orders and Warrants limited the communications of FREDERICK SIMONE, FRANCIS WHITE, John DeMarco, Vincent Roberto, and other unidentified individuals to be intercepted to those involving gaming, usury, extortion, and conspiracy to commit the same.

These orders and warrants authorized interceptions seven days a week from 7:00 a.m. to 12:00 p.m.  From 12:01 a.m. until 6:59 a.m., only pen register and cross-frame trap devices were authorized; no conversations could be monitored or recorded using these devices.

---

[3]Although GIOACCHINI joined SIMONE's motion to suppress physical evidence - specifically, the handgun seized at SIMONE's home on December 9, 2000 - he lacks standing to contest this search since he had no reasonable expectation of privacy in SIMONE's home. GIOACCHINI has not moved to suppress the firearm seized from his residence.

4

Due to technical difficulties, the interception devices on 508/788-1035 were not activated until September 8, 2000.

## 2.   September 19, 2000

On September 19, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the interception of wire communications occurring over the same two telephone numbers, 508/272-0298 and 508/788-1035, both subscribed to by FRED SIMONE, 32 Lowther Road, Framingham, Massachusetts. The communications of FREDERICK SIMONE, FRANCIS WHITE, John DeMarco, Vincent Roberto, Michael Dezotell, and other unidentified individuals to be intercepted were limited to gaming, usury, extortion, and conspiracy to commit the same.

These orders and warrants authorized interceptions seven days a week from 9:00 a.m. to 11:00 p.m.  From 11:01 p.m. until 8:59 a.m., only pen register and cross-frame trap devices were authorized, and no conversations could be monitored or recorded using these devices.  The date of entry and effect for both the 508/272-0298 and the 508/788-1035 orders and warrants was September 20, 2000.  Interceptions pursuant to these orders and warrants were to commence on September 23, 2000, immediately following the expiration of the September 1, 2000, orders and warrants.

On October 2, 2000, the Honorable Margot Botsford amended the 508/272-0298 and 508/788-1035 orders and warrants by extending the monitoring hours from 7:00 a.m. until 11:00 p.m., as of October 4, 2000.

5

### 3.   October 4, 2000

On October 4, 2000, the Honorable Margot Botsford again signed orders and warrants authorizing the interception of wire communications occurring over 508/272-0298 and 508/788-1035, both subscribed to by SIMONE, 32 Lowther Road, Framingham, Massachusetts. The order and warrants authorized the interceptions of communications of SIMONE, WHITE, John DeMarco, Vincent Roberto, Michael Dezotell, Joseph Salvati, Robert Nardolillo, Anthony Musto, and other unidentified individuals with respect to gaming, usury, extortion, and conspiracy to commit the same.

The orders and warrants authorized interceptions seven days a week from 7:00 a.m. to 11:00 p.m. From 11:01 p.m. until 6:59 a.m., only pen register and cross-frame trap devices, which do not monitor or record conversation, were authorized. The date of entry and effect for the 508/272-0298 and 508/788-1035 orders and warrants was October 5, 2000.

### 4.   October 19, 2000

On October 19, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the interception of wire communications occurring over the same telephones, 508/272-0298 and 508/788-1035, both subscribed to by FRED SIMONE, 32 Lowther Road, Framingham, Massachusetts, as well as the interception of oral communications occurring inside 32 Lowther Road, Framingham, Massachusetts. The orders and warrants authorized the interception of communications of SIMONE, WHITE, John DeMarco, Vincent Roberto,

6

Michael Dezotell, Joseph Salvati, Robert Nardolillo, Anthony Musto, Matty Guglielmetti, Joseph Rosato, Adolfo Bruno, and other unidentified individuals, but limited to gaming, usury, extortion, and conspiracy to commit the same.

The orders and warrants authorized interceptions from 7:00 a.m. to 11:00 p.m., seven days a week. From 11:01 p.m. until 6:59 a.m., only pen register and cross-frame trap devices were authorized.

The date of entry for the 508/272-0298 order and warrant was October 19, 2000, and the date of effect was October 20, 2000. The date of entry and effect for the 508/788-1035 order and warrant was October 19, 2000.

The order and warrant to intercept oral communications inside 32 Lowther Road, Framingham, Massachusetts, authorized interceptions seven days a week from 7:00 a.m. to 11:00 p.m., but *only* when (a) a telephone call intercepted over 508/272-0298 or 508/788-1035 revealed that SIMONE and one or more co-conspirators planned to meet at 32 Lowther Road, Framingham, Massachusetts; (b) there were "reasonable grounds to believe that a purpose of said meeting is to discuss the designated offenses;" and (c) law enforcement surveillance confirmed that SIMONE and the co-conspirator identified during the intercepted call were present at 32 Lowther Road, Framingham.

7

### 5.    October 24, 2000

On October 24, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the continued interception of wire communications occurring over 508/272-0298 and 508/788-1035, both subscribed to by SIMONE, 32 Lowther Road, Framingham, Massachusetts, and of oral communications occurring inside 32 Lowther Road, Framingham, Massachusetts. The communications of SIMONE, WHITE, John DeMarco, Vincent Roberto, Michael Dezotell, Joseph Salvati, Robert Nardolillo, Anthony Musto, Matty Guglielmetti, Joseph Rosato, Adolfo Bruno, GIOACCHINI, and other unidentified individuals to be intercepted were limited to communications about gaming, usury, extortion, and conspiracy to commit the same.

The orders and warrants authorized interceptions from 7:00 a.m. to 11:00 p.m., seven days a week. From 11:01 p.m. until 6:59 a.m., only pen register and cross-frame trap devices were authorized, so no conversations could be monitored or recorded. The date of effect for the 508/272-0298 and 508/788-1035 orders and warrants was October 27, 2000.

The order and warrant to intercept oral communications inside 32 Lowther Road, Framingham, Massachusetts, was authorized seven days a week from 7:00 a.m. to 11:00 p.m., but *only* on the same three conditions specified above with respect to the October 19 order. The date of effect for this order and warrant was October 27, 2000.

8

## 6.   November 10, 2000

On November 10, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the continued interception of wire communications occurring over 508/272-0298 and 508/788-1035, both subscribed to by FRED SIMONE, 32 Lowther Road, Framingham, Massachusetts, and of oral communications occurring inside 32 Lowther Road, Framingham, Massachusetts.   The communications of FREDERICK SIMONE, FRANCIS WHITE, John DeMarco, Vincent Roberto, Michael Dezotell, Joseph Salvati, Robert Nardolillo, Anthony Musto, Matthew Guglielmetti, Joseph Rosato, Adolfo Bruno, VINCENT GIOACCHINI, and other unidentified individuals to be intercepted were limited to those involving gaming, usury, extortion, and conspiracy to commit the same.

The orders and warrants authorized interceptions seven days a week from 7:00 a.m. to 11:00 p.m.   From 11:01 p.m. until 6:59 a.m., only pen register and cross-frame trap devices were authorized, but no conversations could be monitored or recorded using these devices.

The order and warrant to intercept oral communications inside 32 Lowther Road, Framingham, Massachusetts, also authorized interceptions seven days a week from 7:00 a.m. to 11:00 p.m., but *only* under the same three conditions described above with respect to the October 19 and October 24 orders -- that is, when a telephone call intercepted over 508/272-0298 or 508/788-1035 revealed that SIMONE and one or more co-conspirators planned to

9

meet at 32 Lowther Road, Framingham, Massachusetts; there were "reasonable grounds to believe that a purpose of said meeting is to discuss the designated offenses;" and surveillance confirmed that SIMONE and the co-conspirator identified during the intercepted call were present at 32 Lowther Road, Framingham.

### 7.  November 22, 2000

On November 22, 2000, the Honorable Margot Botsford signed orders and warrants authorizing the continued interception of wire communications occurring over 508/272-0298 and 508/788-1035, both subscribed to by SIMONE, 32 Lowther Road, Framingham, Massachusetts, and of oral communications occurring inside 32 Lowther Road, Framingham, Massachusetts.  The communications of SIMONE, WHITE, John DeMarco, Vincent Roberto, Michael Dezotell, Joseph Salvati, Robert Nardolillo, Anthony Musto, Matthew Guglielmetti, Joseph Rosato, Adolfo Bruno, VINCENT GIOACCHINI, Anthony Cataldo, and other unidentified individuals to be intercepted were limited to those gaming, usury, extortion, and conspiracy to commit the same.

The orders and warrants authorized interceptions seven days a week from 7:00 a.m. to 11:00 p.m.  Only pen register and cross-frame trap devices were authorized for the hours from 11:01 p.m. to 6:59 a.m.

The order and warrant to intercept oral communications inside 32 Lowther Road, authorized interceptions seven days a week from

10

7:00 a.m. to 11:00 p.m. on the same three conditions outlined in the prior orders.

The date of effect for the 508/272-0298 and 508/788-1035 orders and warrants and the order and warrant to intercept oral communications in SIMONE's home was November 25, 2000, immediately following the expiration of the November 10, 2000, orders and warrants.

## II.   THE STATE ELECTRONIC SURVEILLANCE EVIDENCE WAS LAWFULLY OBTAINED AND IS ADMISSIBLE

In their Amended Motion for Franks Hearing and to Compel Disclosure of Informant Status of Purported Targets, Defendants contend that the Commonwealth lacked probable cause for the electronic surveillance orders issued by Judge Botsford and the orders failed to establish the necessity for electronic surveillance. As set out below, there was ample probable cause to support the issuance of the orders and the use of electronic surveillance was justified because of the failure and inadequacy of normal investigative techniques.

Federal law governs the admissibility of evidence in federal prosecutions. See, e.g., United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994); United States v. Mitro, 880 F.2d 1480, 1485 n.7 (1st Cir. 1989). As a result, "[e]vidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard to state law." United States v. Sutherland, 929 F.2d 765, 769 (1st Cir. 1991)(quoting United States

11

v. Little, 753 F.2d 1420, 1434 (9th Cir. 1984)) (emphasis in original). This is true even when the evidence "is obtained pursuant to a state search warrant or in the course of a state investigation." Mitro, 880 F.2d at 1485 n.7. The First Circuit has specifically held that in federal criminal prosecutions, the admissibility of state electronic surveillance evidence is a question of federal law. Sutherland, 929 F.2d at 771; United States v. Charles, 213 F.3d 10, 21 (1st Cir. 2000).

Title 18, United States Code, Section 2516(2), provides authority for receipt in federal court of state- authorized electronic surveillance. Charles, 213 F.3d at 18. The statute provides, in relevant part:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offenses as to which the application is made ... .

18 U.S.C. §2516(2).

The Commonwealth conducted an electronic surveillance investigation of SIMONE and others pursuant to M.G.L.A. ch. 272, §99. The Botsford Orders were predicated upon affidavits submitted

12

by MSP Trooper Pasquale Russolillo ("Russolillo").    Defendants
contend in their <u>Franks</u> Motion that Russolillo's September 1, 2000,
Affidavit (the "First Affidavit") did not set forth sufficient
probable cause to support a wiretap order, nor did Russolillo's
October 19, 2000, Affidavit (the "Second Affidavit") provide
sufficient probable cause for the installation of a bug in SIMONE's
residence   at   32   Lowther   Road,   Framingham,   Massachusetts.
Defendants' challenge concerning the sufficiency of probable cause
is an attack on the facial validity of the electronic surveillance
affidavits and warrants.

> Title 18, United States Code, Section
> 2518(1)(b), requires that each application for
> an electronic surveillance order include: a
> full and complete statement of the facts and
> circumstances relied upon by the applicant, to
> justify his belief that an order should be
> issued, including (i) details as to the
> particular offense that has been, is being, or
> is about to be committed, (ii) ... a
> particular description of the nature and
> location of the facilities from which or the
> place where the communication is to be
> intercepted, (iii) a particular description of
> the type of communications sought to be
> intercepted, (iv) the identity of the person,
> if known, committing the offense and whose
> communications are to be intercepted.

A court's determination as to the existence of probable cause
sufficient to support issuance of a warrant requires two findings:
that "(1) a crime has been committed - the 'commission' element;
and (2) enumerated evidence of the offense will be found at the
place to be searched - the so called 'nexus element.'"   <u>United
States v. Feliz</u>, 182 F.3d 82, 86 (1st Cir. 1999); <u>United States v.</u>

Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996).    The court must review the affidavit in a practical, common-sense fashion, ensuring that the affidavit sets forth facts that satisfy both the "commission" and "nexus" elements necessary to establish probable cause.    Zayas-Diaz, 95 F.3d at 111, quoting United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993).  The issuing court must have a "substantial basis" to conclude that there was probable cause, based upon a totality of the circumstances.  Taylor, 985 F.2d at 6.

Probable cause is a practical, nontechnical, common-sense concept, which is based upon "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). It is also "a fluid concept – turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In deciding whether to issue a search warrant, a judicial officer must determine whether "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238; see Feliz, 182 F.3d at 86. Probable cause is thus not proof beyond a reasonable doubt or even proof by a preponderance of the evidence. See, e.g., United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) (probable cause to search not tantamount to proof beyond a reasonable doubt). "The probable cause standard 'does not demand

14

showing that such a belief be correct or more likely true than false.'" Feliz, 182 F.3d at 86, quoting Texas v. Brown, 460 U.S. 730, 742 (1983).

Defendants' conclusory assertions that there was an insufficient factual basis to establish probable cause for either the initial wiretap warrant or the installation of listening devices at 32 Lowther Road are fundamentally flawed. Rather than considering the totality of circumstances in the affidavit, they dissect each piece of information in the affidavit one at a time. In addition, they disregard the applicable legal standards and standards of review. A fair reading of the facts set forth in the affidavits, considered in their entirety, clearly establishes that there was sufficient probable cause to support Judge Botsford's issuance of the wiretap orders.

In reviewing the sufficiency of an affidavit, this Court considers whether the "totality of the circumstances" stated in the affidavit demonstrate probable cause to search the premises, according "'considerable deference to reasonable inferences the [issuing justice] may have drawn from the attested facts.'" United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002), quoting Zayas-Diaz, 95 F.3d at 111 (internal quotations omitted). See United States v. Nelson Rodriguez, 319 F.3d 12, 32 (1st Cir.), cert. denied, 539 U.S. 928 (2003) (district court and appeals court use same standard to evaluate issuing judge's conclusions). The Court examines "the face of the affidavit" to "'decide if the facts set

15

forth in the application were minimally adequate to support the determination that was made.'" Nelson-Rodriguez, 319 F.3d at 32, quoting United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977). The sufficiency of an affidavit must be tested on the basis of its allegations as a whole, United States v. Beckett, 321 F.3d 26 (1st Cir. 2003) -- not by first dissecting the affidavit and then subjecting each resulting fragment to a hypertechnical test of its sufficiency. See United States v. Leisure, 844 F.2d 1347 (8th Cir. 1988). Further, in a "doubtful or marginal case," the First Circuit has said that the court should "defer[] to an issuing magistrate's 'probable cause' determination." Zayas-Diaz, 95 F.3d at 111; see United States v. Ventresca, 380 U.S. 102, 109 (1965).

Under Massachusetts law, when an affidavit in support of a search warrant relies on information provided by a confidential informant, the basis for belief that the informant's information is reliable must be set forth in the affidavit in order to establish probable cause. M.G.L. c. 272, §99(F)(3); Commonwealth v. Upton, 394 Mass. 363, 374 (1985). Massachusetts courts use a two-pronged test for determining an informant's reliability (the "Aguilar-Spinelli test"). The magistrate must be informed of: 1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the "basis of knowledge" test); and 2) some of the underlying circumstances from which the affiant concluded that the informant was "credible" or his information "reliable" (the "veracity" test). Aguilar v.

16

Texas, 378 U.S. 108, 114 (1964).  A failure to satisfy both aspects of the test is not necessarily fatal to the reliability of the informant's information.  Even if the informant's tip does not satisfy both prongs of the Aguilar test, other allegations in the affidavit that corroborate the information may support a finding of probable cause.  Spinelli v. United States, 393 U.S. 410, 415 (1969); Upton, 394 Mass. at 374.  This independent corroboration may satisfy either or both prongs of the Aguilar-Spinelli inquiry. Commonwealth v. Carrasco, 405 Mass. 316, 321 (1989).

In Gates, the Supreme Court overruled Aguilar and Spinelli by supplanting the "two-pronged" test with a more flexible "totality of the circumstances" test.  Gates, 462 U.S. at 233.  The Court acknowledged, however, that the Aguilar-Spinelli factors remain "relevant considerations."  Gates, 462 U.S. at 233; Khounsavanh, 113 F.3d at 284.  Massachusetts has rejected the more open-ended Gates test, preferring to adhere to the original Aguilar-Spinelli test as a matter of state law.  See Upton, 394 Mass. at 375.[4]

---

[4]In rejecting SIMONE's motions to suppress, based, in part, upon a claim of insufficient probable cause, in Commonwealth v. Simone, Indictment No. 2001-49-001-002 on May 12, 2004, Massachusetts Superior Court Associate Justice Sandra L. Hamlin employed the stricter Aguilar-Spinelli standard, and concluded that the affidavits set forth sufficient probable cause for the wiretap warrants.

**A.**  **Judge Botsford Properly Concluded That The First Affidavit Established Probable Cause To Believe The Designated Offenses Had Been, Were Being, Or Were About To Be, Committed, And That Evidence Of Those Offenses Would Be Intercepted Over Telephone Numbers 508/272-0298 and 508/788-1035.**

It is well-settled that absent extraordinary circumstances, a challenge to the legal validity of an electronic surveillance warrant is limited to the four corners of the supporting affidavit. Nelson-Rodriguez, 319 F.3d at 32; United States v. Southard, 700 F.2d 1, 7 (1st Cir. 1983).  See also Franks, 438 U.S. at 168. Further, "[a] wiretap authorization order is presumed proper, and the defendants have the burden[s] of overcoming that presumption" in order to warrant suppression. United States v. Nunez, 877 F.2d 1470, 1472 (10th Cir. 1989).  "The defendants must come forward with a prima facie showing that the wiretap was conducted pursuant to an illegal order." United States v. Crumpton, 54 F. Supp. 2d 986, 1003 (D. Colo. 1999), quoting United States v. Bennett, 825 F. Supp. 1512, 1518 (D. Colo. 1993).  See also United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990).

Not every failure to comply with the requirements of the wiretap statute renders the interception of wire or oral communications unlawful. United States v. Chavez, 416 U.S. 562, 574-75 (1974). The defendant must not only demonstrate a deviation from the statutory requirements, but that the deviation is substantial.  Id.  Moreover, even if a defendant proved that the wiretap statute had been violated, suppression is not mandated; the

court has discretion to fashion a remedy if required. <u>See</u>, <u>e.g.</u>, <u>Hoffman</u>, 832 F.2d at 1309; <u>see also</u> <u>Clark v. United States</u>, 755 F.2d 1026 (D.C. Cir. 2000)(limiting the extension of the "fruit of the poisonous tree doctrine" in a wiretap case because the statutory "taint" was <u>de minimis</u>).

The Defendants here, like those in <u>Leisure</u>, "engage in a 'divide and conquer' attack on the Affidavits and urge this Court to undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole." 844 F.2d at 1354. This Court should "decline this invitation to review the affidavit in an overly stringent and hypertechnical fashion." <u>Id.</u> <u>Accord</u>, <u>United States v. Santarpio</u>, 560 F.2d 448, 453 (1st Cir. 1977)(affidavits providing probable cause not to be read in a "hypertechnical manner;" "commonsense interpretation" to be used): <u>United States v. Townsley</u>, 843 F.2d 1070, 1076 (8th Cir. 1988)("punctilious paragraph-by-paragraph dissection of the supporting affidavit [is] ... not our standard of review"). As the Second Circuit has stated, courts should not "read supporting affidavits with the same microscopic intensity as municipal bond counsel would a bond indenture." <u>United States v. Pond</u>, 523 F.2d 210, 214 (2d Cir. 1975).[5]

---

[5] <u>Pond</u>, unlike <u>Leisure</u>, <u>Santarpio</u>, and <u>Townsley</u>, involved a search warrant rather than electronic surveillance. Of course, the standards by which a court determines probable cause to support issuance of an electronic surveillance order are the same as those used in conventional search warrant cases. <u>United States v. Armendariz</u>, 922 F.2d 602, 608 (10th Cir. 1991); <u>United States v. Gallo</u>, 863 F.2d 185, 191 (2d Cir. 1988); <u>Leisure</u>, 844 F.2d at 1354;

A review of Russolillo's First Affidavit demonstrates that it satisfied the relevant standards and contained more than sufficient facts to establish probable cause for the interception of wire communications over the SIMONE telephones. Although the following facts do not represent the entirety of the relevant facts in the First Affidavit, they reflect the probable cause showing made and are sufficient to demonstrate probable cause.

In the First Affidavit, Russolillo relied upon information from several reliable confidential informants ("CIs"), along with information from a cooperating individual, Robert C. Luisi, Jr. ("Luisi"), and independent police investigation.[6] This information clearly satisfied the Gates standard for probable cause.

### 1. Luisi

The First Affidavit described Luisi as a "made" member of the Philadelphia Family of La Cosa Nostra ("LCN") in 1998, who, at the time of his 1999 arrest on federal drug charges, held the position of "Capo Regime," or captain in the Philadelphia Family.[7] Luisi

---

United States v. Talbert, 706 F.2d 464, 467 (4th Cir. 1983).

[6]As the First Affidavit makes clear, the MSP used independent investigative techniques to corroborate the CIs' information and gather other information. The First Affidavit also set forth the CIs' admissions regarding their own criminal activities, and identified Luisi as a cooperating witness, attaching his plea agreement to the First Affidavit as an exhibit.

[7]La Cosa Nostra, also known as "This Thing Of Ours" and "This Thing," is a secret criminal organization which operates throughout the United States and the world. Traditionally, the LCN has had a rigid hierarchical structure and its own system of laws. The LCN is composed of families, each of which controls a designated geographical area. Each Family is headed by a Boss who has

20

was actively engaged in drug distribution, loansharking, and extortion, and ran bookmaking operations in the greater Boston area, including Revere and Medford, before his arrest (First Affidavit, pp. 16-17). On June 14, 2000, Luisi pleaded guilty in United States District Court for the District of Massachusetts to a superseding information that charged him with violating the federal racketeering statute, 18 U.S.C. §1962 (p. 15).[8] As part of that guilty plea, Luisi admitted, among other things, his membership in traditional and non-traditional organized crime groups, including the LCN. Luisi also admitted his guilt to several predicate acts of racketeering, including conspiracy to murder in violation of the laws of the Commonwealth of Massachusetts, narcotics distribution, operating an illegal gambling business, Hobbs Act extortion (that is, collecting "rent" or tribute from bookmakers and others involved in illegal activity), and loansharking (p. 15).

The First Affidavit also set forth Luisi's overview of the LCN's operation in the Boston area, a description similar to that

---

absolute authority within his Family. A "Consigliere" or counselor acts as the advisor to the Family. The Underboss, who is the second-in-command, assists the Boss in running the Family and acts for him in his absence. Below the Underboss are a number of "Capo Regimes" who supervise the illegal activities of members and associates. Soldiers or "made" (baptized) members of the Family report to the Capo Regimes. Associates, while not "made" members of the Family, participate in crimes on behalf of the Family and share their criminal proceeds with the members of the Family. (First Affidavit, p. 13).

[8]This superseding information was attached to the First Affidavit as Exhibit 1.

provided by the expert testimony during United States v. Angiulo, 897 F.2d 1169 (1st Cir. 1990). According to Luisi, LCN members "go after" loansharks, bookmakers, and drug dealers by demanding payment, known as "rent" or "tribute," from loansharks', bookmakers', and drug dealers' illegal operations (p. 15). The loanshark, bookmaker, or drug dealer pays the demanded rent to the LCN member, Luisi stated, in order to continue to operate his illegal business (p. 15). The First Affidavit also stated that LCN members obtain these rent payments by means of intimidation or by threatening violence and/or destruction -- implicitly or explicitly -- of the victim's illegal business should the victim fail or refuse to comply with the payment demand (p. 15).

Luisi also detailed how he personally met with SIMONE and other "made" members of the LCN to discuss extortion, gaming, and loansharking (p. 18). According to Luisi, he and SIMONE were rivals who competed for the same economic interests (pp. 17, 18). Luisi further stated that he often discussed criminal activity and arranged meetings with SIMONE over both of the targeted telephones (i.e., the telephones for which the Commonwealth sought wiretap authorization) using "coded" language. The First Affidavit recounted Luisi's description of an incident in which SIMONE approached Luisi and specifically told him to leave a bookmaker (Michael Dezotell) alone because the bookmaker was "with SIMONE" (p. 22). When Luisi was arrested on June 26, 1999, on federal drug charges, he had in his possession two telephone numbers of SIMONE,

22