one the targeted cell phone number subscribed to by SIMONE (508/272-0298), and the second a then recently disconnected number subscribed to by SIMONE (p. 19).

The First Affidavit also described in some detail Luisi's rent collection schemes and attempted extortion efforts. Luisi identified Michael Dezotell, Chris Kotsiopoulos, Vincent Roberto, and Joseph Zampanti as bookmakers, and described his interaction with SIMONE in connection with each of these individuals. But Luisi's own observations concerning SIMONE and rent collections did not stand alone in the First Affidavit. They were corroborated throughout the First Affidavit by statements provided by CIs. For example, at pages 28, 34, 35, 42, 44, and 45 of the First Affidavit, informants identified as CI-1, CI-2, and CI-3 bolstered Luisi's statements concerning Dezotell and Roberto. CI-4 corroborated information provided by Luisi as well (pp. 46-47). The First Affidavit also set forth the independent law enforcement investigation that corroborated information Luisi provided concerning SIMONE and the scope of his criminal enterprise. In addition, Luisi's plea agreement offered further corroboration of his veracity, as he provided the government with information about the LCN and his criminal activities as part of his contractual obligations under the agreement in return for sentencing consideration pursuant to the terms of that agreement (p. 15).

Defendants nonetheless contend that Russolillo's First Affidavit failed to provide the basis for Luisi's observations. In

23

particular, Defendants challenge the basis of Luisi's information concerning WHITE, which they characterize as unreliable. Claiming bias and a motive to prevaricate, they also dismiss, without argument, all of Luisi's observations concerning SIMONE.[9]

A review of the First Affidavit establishes the lack of merit in Defendants' claims. According to the First Affidavit, Luisi stated that he personally extorted rent from defendant FRANCIS WHITE, "a loanshark in East Boston and the North End," and that he began doing so after "the Salemmes" went to jail (p. 20). Luisi also described his interaction with WHITE concerning a $50,000 loan on which he personally paid WHITE and John DeMarco 1% interest, known as "juice" or "vig."[10] He described WHITE's and SIMONE's relationship in the loansharking business, and described an incident in which he refused to pay off the principal of an usurious loan to WHITE and SIMONE. Luisi further detailed how he personally aided WHITE's shylocking business and allowed WHITE to use his (Luisi's) name during the collection of loans. According to the First Affidavit, Luisi claimed that "SIMONE is definitely his [WHITE's] guy," and SIMONE and WHITE were partners in the loansharking business (p. 20).

---

[9] Defendants failed to develop this argument adequately, and it should therefore be dismissed. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, Defendants' unsubstantiated claims of bias and motive to prevaricate fly in the face of a fair reading of the affidavit in its entirety.

[10] The terms "juice" and "vig" refer to interest due to a loanshark per week on an outstanding loan.

## 2.   Information From The 2000 Essex County Wiretap

The First Affidavit also detailed the independent corroboration of Luisi's information by electronic interceptions from an Essex County wiretap conducted from January through March 2000.[11]  The First Affidavit described interceptions in which individuals discussed rent payments to SIMONE during 2000.[12]  For example, in an intercepted conversation on March 8, 2000 (Exhibit 7 to the First Affidavit), Anthony Musto told Vincent Roberto to pick up rent payments for SIMONE from Chris Kotsiopoulos (pp. 33, 34).  Russolillo then described a later interception, on March 9, 2000 (Exhibit 9 to the First Affidavit), during which SIMONE sent Musto to pick up rent ("two ties") left for SIMONE by "Mike" (Dezotell) (pp. 34, 35).   The Essex County wiretap thus independently corroborated Luisi, who in turn buttressed information provided by CI-1 through CI-6.[13]

---

[11]On January 13, 2000, Massachusetts Superior Court Associate Justice Isaac Borenstein authorized the interception of wire communications over two telephones used by members of the Zampanti gaming organization. The authorization to conduct these wiretaps continued through March of 2000.

[12]Attached to the First Affidavit were 11 exhibits, including transcripts of conversations intercepted during the Essex County wiretap. Those transcribed conversations detail ongoing collections and payments of "tribute" or rent to SIMONE.

[13]Although the Essex County interceptions were cited throughout the First Affidavit, the government will not attempt to summarize those conversations here. Any challenge to Russolillo's interpretation of those intercepted conversations is unpersuasive for two reasons.  First, the background and expertise of the affiant and his immediate supervisor, MSP Lieutenant John Tutungian, was set forth in the First Affidavit, and was a factor upon which Judge Botsford could rely. See United States v. Ashley,

### 3.   Information Provided By Confidential Informants

Both the Essex County wiretaps and Luisi also corroborated the information from the six CIs that was set forth in the First Affidavit.    The following paragraphs highlight some of the pertinent information from the First Affidavit regarding the CIs' reliability and knowledge.

   a.   CI-1.

   According to the First Affidavit, CI-1 provided information to the MSP on more than 100 occasions over the course of at least ten years (pp. 40-41).  CI-1's information came from his personal associations and his/her own status as a bookmaker and bettor.   CI-1 identified Leonard Teperow as a bookmaker who was being extorted by SIMONE as recently as April 2000 (pp. 41-42). CI-1 knew Teperow, a convicted bookmaker, and his gaming associates (p. 41).  CI-1 also reported that Vincent Roberto actively identified bookmakers for SIMONE to extort (p. 42).

   CI-1's veracity was demonstrated, in part, by the fact that his/her information resulted in the arrest and conviction of over ten individuals for gaming-related

_____

876 F.2d 1069, 1072 (1st Cir. 1989).   This is especially true where, as here, the interceptees used cryptic or coded language in order to avoid detection.   Second, complete transcripts of the pertinent telephone conversations were attached as exhibits to the First Affidavit, so that Judge Botsford could independently review them to determine their relevance and meaning.

crimes, as well as seizures of gaming records and apparatus.

b.  CI-2.

CI-2 had been known to the MSP for five years at the time of the First Affidavit, and was an experienced bookmaker who had personal knowledge of and direct contact with bookmakers and their associates (pp. 42-43). CI-2 described how SIMONE personally approached him/her and demanded the rent payment for CI-2 to continue operating his bookmaking business (p. 43). CI-2 told the MSP that three bookmakers personally told him/her that SIMONE had approached them in a "hostile manner" and demanded rent (p. 43). CI-2 corroborated information from CI-1 that SIMONE was extorting rent from Teperow and Dezotell (p. 44). CI-2 also discussed SIMONE's sphere of influence in the "rackets," stating that SIMONE had squashed a gambling debt owed to Mario Marquardo.[14]

The First Affidavit reported that CI-2 had provided information to MSP Trooper Michael Scanlan about illegal betting in Massachusetts that had proven reliable and true. The MSP confirmed that the telephone numbers CI-2 supplied were in fact associated with the bookmakers and the organized crime member CI-2 named. This information,

[14]This information also indirectly corroborated Luisi's statement that organized crime members control gambling through intimidation, by directing which debts are paid.

27

in turn, has proven quite useful in the MSP's gathering of intelligence on organized crime and bookmakers (p. 42-43).

c.  CI-3.

The First Affidavit described CI-3 as an individual known to the MSP for seven years, who had been a bookmaker for 15 years. (p. 45). CI-3 was an associate of a bookmaker SIMONE extorted; CI-3 learned about SIMONE's rent extortion directly from the bookmaker (p. 45). SIMONE personally told CI-3 that SIMONE expected "back rent" for the entire period SIMONE had spent in prison (p.45).[15] SIMONE also gave CI-3 his telephone number and advised CI-3 to call him any time he/she had problems with his/her gaming activities (p. 46). CI-3 stated that he/she in fact called SIMONE on his cell phone to discuss gaming problems (p. 46).

The First Affidavit noted that CI-3's veracity was established by statements he/she made to the MSP against his/her penal interest. CI-3 admitted to the MSP "that he/she has placed illegal wagers on professional and college sporting events for more than fifteen (15) years

---

[15]SIMONE was sentenced to 10 to 15 years in state prison on January 6, 1988, in Essex Superior Court, Docket No. 011522, for conspiracy to murder Angelo Patrizzi. According to the records of the Massachusetts Department of Correction, SIMONE was released from prison in 1998.

and has registered wagers from others, with several different local bookmaking offices" (p. 45).

d.   CI-4.

CI-4 had been known to the MSP for approximately one year before the filing of the First Affidavit. CI-4 had personal knowledge based upon his own gaming experience. CI-4 had previously cooperated with the Boston Police Department, which cooperation resulted in the interception of gaming conversations and the seizure of gaming evidence (p. 46). CI-4 learned from a close associate of Vincent Roberto that SIMONE extorted rent from Roberto, Kotsiopoulos, and Dezotell (pp. 46-47).

e.   CI-5.

CI-5 had been known to the MSP for two years before the First Affidavit was filed. CI-5 was a loansharking victim of WHITE, who paid WHITE more than 50% per annum in juice or vig (pp. 47-48). CI-5 observed WHITE and SIMONE together (p. 47). Information from CI-5 was corroborated by the Essex County wiretap, Luisi, and the MSP's physical surveillance.

f.   CI-6.

CI-6 had been known to the MSP for approximately six months prior to the filing of the First Affidavit. CI-6 is a bookmaker who reported that SIMONE contacted him/her

and demanded rent (p. 49). CI-6 admitted paying rent to

SIMONE to continue his/her illegal bookmaking activities.

The First Circuit has stated that "[w]here an affidavit relies

on the reports of unnamed informants, it must provide some

information upon which the issuing judge can assess the credibility

of the informant's information." Barnard, 299 F.3d at 93. The

Court provided the following nonexhaustive list of factors a

reviewing court should consider:

> [w]hether an affidavit supports the probable
> veracity or basis of knowledge of the persons
> supplying   hearsay   information;   whether
> informant statements are self-authenticating;
> whether some or all of the informant's factual
> statements   were   corroborated   wherever
> reasonable and practicable...; and whether a
> law   enforcement   affiant   included   a
> professional   assessment   of   the   probable
> significance of the facts related to the
> informant based on experience or expertise.

Id., quoting Khounsavanh, 113 F.3d at 284.

The personal observations and close contact information

provided by the six CIs described in the First Affidavit easily

satisfy the "basis of knowledge" prong of the Aguilar-Spinelli

test, as well as the more liberal totality of circumstances set

forth in Gates -- that is, the First Affidavit sets forth

sufficient facts to establish the basis of each CI's knowledge for

the information he/she provided the MSP.[16]    Moreover, the

---

[16]Corroboration of an informant's tip may come from independent
sources, see Spinelli, 393 U.S. at 415, or from the contents of the
tip itself when an informant implicates himself in a crime, United
States v. Harris, 403 U.S. 573, 574 (1971). In Harris, a plurality
of the Supreme Court found a "substantial basis" for crediting an

information provided by the CIs also demonstrates the CIs' veracity (the second Aguilar-Spinelli prong), because that information was against the CIs' penal interest, as it implicated each CI in some illegal activity. Accordingly, the issuing magistrate properly considered each CI's statements in evaluating that CI's veracity.[17]

### 4. Information From Physical Surveillance, Toll Analysis and Pen Registers.

The information from the CIs and Luisi was further corroborated by telephone toll analysis (First Affidavit, pp. 62-74), physical surveillance (pp. 58-62), and evidence gathered from pen registers (pp. 74-78). The information obtained from these methods was limited, however, as it has been in numerous other organized crime investigations (p. 59). Russolillo noted, for example, that prolonged physical surveillance was not possible in this case because of the nature of organized crime and the targets'

---

informant's information despite his/her lack of any track record or extrinsic corroboration. Chief Justice Burger noted that the Court in Jones v. United States, 362 U.S. 257 (1960), "never suggested that an averment of previous reliability was necessary," and concluded that the informant's admissions of his own criminal involvement -- his declarations against penal interest -- carried their own indicia of credibility. Harris, 403 U.S. at 581-583. "People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions." Id. at 583. See also United States v. Schaefer, 87 F.3d 562, 566 (1st Cir. 1996) (same).

[17]Mutual corroboration by multiple informants, each of whom satisfies only one prong of the Aguilar-Spinelli test (i.e., the basis of knowledge and veracity), may compensate for deficiencies in an individual informant's tip. See, e.g., Khounsavanh, 113 F.3d at 284. In this case, each CI corroborates another in significant respects. Thus, even if the Court determines that no one CI satisfies both prongs, the corroborative nature of the information is sufficient to satisfy Gates or Aguilar-Spinelli.

consistent use of counter-surveillance techniques. Even the limited surveillance conducted here, however, corroborated the CIs' and Luisi's information regarding SIMONE, his contacts and his associations (p. 60), and demonstrated that the CIs' information about ongoing payments of rent to SIMONE from 1998 through the end of the wiretap investigation was timely and not stale.

## 5. FBI Sources, Physical Surveillance, and Pen Register Results.

In the First Affidavit, Russolillo stated that he had had access to those FBI files that contained relevant source information and reports of physical surveillance of SIMONE's criminal activities.[18] Russolillo detailed the FBI sources' information in the First Affidavit (pp. 49-54, 61-62), and established that that information corroborated, and was corroborated by, information from Luisi, CI-1 through CI-6, and the Essex County wiretap (pp. 50-51). Russolillo further stated that the FBI's physical surveillance independently corroborated the other information in the affidavit as well (p. 62). The first affidavit also discusses the usage, results, and limitations of pen register devices employed in investigating SIMONE (pp. 74-78).

As this brief summary demonstrates, the First Affidavit provided ample support for Judge Botsford's conclusion that the totality of the circumstances established that there was probable

---

[18]The FBI's sources (CIs) were not the same as Luisi or CI-1 through CI-6.

cause to believe SIMONE and others were committing, or had committed, the offenses of gaming, loansharking, and extortion, and that evidence of that criminal activity would be intercepted over the targeted telephones.  Judge Botsford thus properly exercised her discretion and authority in issuing the wiretap warrants.

**B.    Judge Botsford Properly Found That The Second Affidavit Set Forth Sufficient Facts To Establish Probable Cause That SIMONE's Residence Was Being Used For Illegal Activity.**

Defendants also challenge the probable cause showing in Russolillo's Second Affidavit. In particular, they claim that the Second Affidavit failed to establish probable cause that SIMONE's residence at 32 Lowther Road in Framingham was being used for illegal activity.  They also argue that there is an enhanced standard of probable cause for a bugging device such as that used here, based upon a heightened privacy interest.[19]  Defendants' claims are without merit.

As discussed above, the Second Affidavit sought a third renewal of the wiretap warrant for SIMONE's residential and

---

[19]Defendants appear to confuse the minimization requirements for this type of electronic surveillance (interceptions of oral communications) with probable cause.   Judicially-authorized wiretaps mandate the use of minimization procedures designed to ensure that officers listen only to criminal conversations, by minimizing non-pertinent or private conversations. The affidavits and warrants in this case serve as a paradigm of minimization designed to limit the intrusion. For example, the Botsford Orders required that before any electronic surveillance of oral communications inside SIMONE residence's on Lowther Road could begin, there had to be a telephone call between SIMONE and a co-conspirator arranging to meet, and independent physical surveillance that confirmed the meeting.

33

cellular telephones, together with authorization to place a bugging device inside SIMONE's home at 32 Lowther Road in order to intercept certain oral communications.[20]    In support of his application, beginning at page 9 of the Second Affidavit, Russolillo established that there was a pattern of telephone calls and meetings inside 32 Lowther Road during the relevant time period.    The calls, which were cryptic in nature, resulted in meetings inside 32 Lowther Road.    Based upon telephone interceptions, CIs, and physical surveillance, Russolillo opined in the Second Affidavit that the meetings involved the payment of rent, as well as discussions about gaming, loansharking, and extortion.    In addition, the Second Affidavit stated that the meetings involved discussions of threats made by a competing organized crime faction that was seeking to move in on SIMONE (pp. 13, 15).    For example, in a telephone call with Joseph Salvati on October 12, 2000, SIMONE pointed out the significance of meeting inside Lowther Road with a long-term LCN member, Adolfo Bruno, to discuss important matters out of the public's eye:

SIMONE:    I'd rather him come out here, if it's important, because I don't want everybody seein' that, you know what I'm sayin'? ... He might be comin' with a message or something, you know what I'm sayin'?

___

[20]The defendants do not appear to raise a new and independent challenge to the sufficiency of the Second Affidavit with respect to the authorization for the telephones, but limit their claims to the authorization for the bugging device.    The government notes that each renewal affidavit incorporated the previous affidavits in their entirety.

Salvati acknowledged the importance of having such a meeting inside Lowther Road: "I got you, no problem." (pp. 20-21).

The Second Affidavit also described SIMONE's attempts to set up meetings inside his home at 32 Lowther Road with members of the LCN Family in Rhode Island, in an effort to discuss the threats on SIMONE's faction by a competing faction of the LCN in East Boston (p. 21).

The Second Affidavit also set forth details of SIMONE's practice of calling and summoning individuals to his home to meet. In particular, the Second Affidavit detailed the meetings and the individuals involved (Dezotell, Roberto, Musto, and others), and pointed out the significance of the timing of certain calls and meetings inside Lowther Road -- that is, that those calls and meetings corresponded to the monthly time period when rent was due to SIMONE (p. 31). These meetings were confirmed by law enforcement agents conducting physical surveillance.

The Second Affidavit also included the following specific information:

## 1.   **Michael Dezotell.**

The Second Affidavit described a meeting between Dezotell and SIMONE (pp. 10-14). Russolillo opined, based upon telephone interceptions and physical surveillance, that the meeting was for Dezotell to deliver rent to SIMONE and to discuss threats that had been made against Dezotell.

35

## 2.    Joseph Salvati.

Salvati was a friend and associate of SIMONE. At the time of the Second Affidavit, October 19, 2000, SIMONE's driver's license had been suspended because of his pending state charges of operating under the influence of alcohol. As a result, over the course of several weeks, Salvati drove SIMONE's car to pick up SIMONE and take him to various locations. Salvati was also instrumental in attempting to set up a meeting inside Lowther Road between made LCN member Adolfo Bruno and SIMONE. In addition, Salvati contacted SIMONE to arrange a meeting after Salvati was approached and threatened regarding a $5,000 debt he (Salvati) owed (pp. 15-17).

## 3.    Adolfo Bruno.

The Second Affidavit identified Adolfo Bruno as a "soldier in the Genovese LCN Family" who works out of Springfield, Massachusetts (p. 18). Bruno's criminal history included convictions for conspiracy to violate RICO, and federal and state gaming violations (p. 19). When SIMONE received word from his associates, including Salvati and Dezotell, that they were being threatened, he reached out to Bruno for a meeting inside 32 Lowther Road. To accommodate Bruno's meeting with an attorney, however, Bruno and SIMONE eventually met at the Boston Harbor Hotel on October 12, 2000 (p. 24).[21]

---

[21]Pamela Harris-Daley, Esq. ("Harris-Daley"), SIMONE's girlfriend (see Harris-Daley Affidavits), drove SIMONE to this

### 4.   John DeMarco.

According to the Second Affidavit (as well as earlier affidavits), DeMarco collected rent for SIMONE and juice for WHITE. The Second Affidavit detailed attempts by SIMONE to arrange a meeting inside SIMONE's residence at 32 Lowther Road with DeMarco to discuss something "very important" (p. 26). SIMONE instructed DeMarco to get the keys to SIMONE's car from Salvati if necessary in order to meet him at 32 Lowther Road (p. 26).

### 5.   Anthony Musto.

As described in the First Affidavit, Musto was responsible for making the rent payments to SIMONE on behalf of the Roberto and Kotsiopoulos gaming organizations (pp. 32-35). Based upon a series of calls and meetings inside Lowther Road, which were confirmed by physical surveillance, Russolillo opined in the Second Affidavit that Musto met SIMONE at SIMONE's home in September and October 2000 to make rent payments (p. 31).

This information, as well as all of the other information in the Second Affidavit, was more than sufficient to establish that evidence of the designated offenses of gaming, extortion, and loansharking would be intercepted during meetings inside SIMONE's home at 32 Lowther Road in Framingham. The issuing judge properly concluded that there was ample probable cause to support the

---

meeting.  The Russolillo affidavits describe the fact that Salvati often chauffeured SIMONE in Harris-Daley's automobile.  Harris-Daley has submitted an affidavit in support of Defendants' Motion for a Franks hearing.

interception of oral communications at SIMONE's home, and authorized the placement of a bug inside that home.

**C.**  **Judge Botsford Properly Found That The First Affidavit Established That Normal Investigative Procedures Had Been Tried And Had Failed, Or Reasonably Appeared Unlikely To Succeed If Tried.**

Defendants mount a two-pronged attack on the "necessity" provisions in Trooper Russolillo's First Affidavit.  First, they raise a facial challenge, claiming that normal investigative techniques would have been sufficient, rendering electronic surveillance unnecessary and without legal justification.  Second, they argue that Russolillo made materially false statements and/or omissions in his First Affidavit, masking the identities of two CIs by naming them as targets of the electronic surveillance.  Both claims are without merit.

The Massachusetts wiretap statute provides that a warrant authorizing a wiretap may issue only on "a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." M.G.L.A. ch. 272, §9E3.  The Massachusetts Supreme Judicial Court has stated that "[t]his statutory provision is practically identical to the federal wiretap statute." Fenderson, 410 Mass. at 83; Commonwealth v. Vitello, 367 Mass. 224, 259 (1975).  The necessity provision of the federal wiretap statute provides that each application for an electronic surveillance order shall include, inter alia:

38

> a full and complete statement as to whether or
> not other investigative procedures have been
> tried and failed or why they reasonably appear
> to be unlikely to succeed if tried or to be
> too dangerous.

18 U.S.C. §2518(1)(c).   The Supreme Judicial Court has limned the state necessity provision using federal case law.  Fenderson, 410 Mass. at 84.

In United States v. Kahn, 415 U.S. 143 (1974), the Supreme Court stated that the necessity requirement is meant to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  Id. at 153 n.12.   Law enforcement officials need not exhaust every conceivable alternative investigative technique before obtaining a wiretap, however.   United States v. Canales Gomez, 358 F.3d 1221, 1225-26 (9th Cir.), cert. denied, 125 S.Ct. 227 (2004); United States v. Gambale, 610 F. Supp. 1515, 1520 (D. Mass. 1985).  See, e.g., United States v. Cole, 807 F.2d 262, 267 (1st Cir. 1986). Investigators are required only to give serious consideration to non-wiretap techniques prior to applying for a wiretap and to inform the judge of the reasons for their belief that such non-wiretap techniques have been and would likely be inadequate. United States v. Lambert, 771 F.2d 83, 91 (6th Cir. 1985). Determining whether the "Government has satisfied this requirement must be made against flexible standards, and each case must be examined on its own facts," United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978), while considering the goals of the

39

investigation, United States v. Jackson, 1998 WL 149582 (N.D. Ill. 2001). An affidavit is thus sufficient if it indicates that there is a reasonable likelihood that normal investigative techniques have failed in gathering evidence, or would fail if attempted. Ashley, 876 F.2d at 1073.

Review of the issuing judge's determination that normal investigative techniques had failed or were likely to fail is limited to whether the supporting facts were "minimally adequate" to support the issuing judge's findings.[22]  United States v. O'Malley, 764 F.2d 38, 43 (1st Cir. 1985); see Ashley, 876 F.2d at 1074. The reviewing court, whether in a suppression hearing or on appeal, does not make a de novo determination of sufficiency as if it were the issuing judge. Ashley, 876 F.2d at 1074. Rather, the reviewing court must uphold the sufficiency of the affidavit if the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared unlikely to succeed. See Scibelli, 549 F.2d at 226. In making this determination, the court must read the affidavit in a practical and common sense

---

[22]It is the issuing judge who must review the wiretap application "to make a determination that the affidavit illustrates sufficient antecedent investigatory efforts." Ashley, 876 F.2d at 1073.  See also United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003); United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003), cert. denied, 124 S. Ct. 1478 (2004). The issuing judge may consider the nature of the crime under investigation, In Re Dunn, 507 F.2d 195, 197 (1st Cir. 1974), and may give weight to the opinion of the officers investigating the crime and seeking the wiretap warrant, United States v. DiMuro, 540 F.2d 503, 510 (1st Cir. 1976).

40

manner. <u>United States v. Calle-Cardenas</u>, 837 F.2d 30, 31 (1st Cir. 1988).

Judge Botsford properly determined that the information provided in the First Affidavit (pp. 7-8) more than adequately satisfied the necessity requirement. Russolillo's discussion in the First Affidavit of the targets' use of "counter-surveillance" techniques and possible attempts to identify undercover operatives, the failure of witnesses to testify, the large number of individuals and locations involved in the investigation, and the inability of CIs to reach the leaders of the conspiracy, provided a reliable basis for Judge Botsford's conclusion that other investigative techniques had been tried and had failed or were not likely to succeed. <u>See</u> Order at p. 5. In particular, the following facts in the First Affidavit supported Judge Botsford's analysis of the government's showing of necessity:

## 1. **Goals of the Investigation**.

The sufficiency of other investigative measures must be evaluated in light of the stated overall goals of the investigation as set forth in the affidavit in support of the wiretap, including, for instance, identifying the participants, means, method, and scope of a targeted operation or conspiracy. <u>See</u> <u>Canales Gomez</u>, 358 F.3d at 1226; <u>United States v. Armocida</u>, 515 F.2d 49 (3d Cir. 1975); <u>United States v. Robinson</u>, 698 F.2d 448, 453 (D.C. Cir. 1983). In addition, the judge "may 'consider the nature of the alleged crimes.'" <u>Scibelli</u>, 549 F.2d at 227 (citations omitted);

41

see id. ("a large-scale gambling conspiracy may by its structure and modus operandi give rise to a reasonable inference that 'other investigative procedures ... reasonably appear to be unlikely to succeed if tried.'").

In the First Affidavit, Russolillo set forth the goals of the investigation into SIMONE's operation:

> A primary goal of this investigation is to penetrate the gaming, criminal usury and extortion conspiracy or conspiracies described in this affidavit, and to identify, apprehend, and bring about the successful prosecution of the persons involved in all levels of the conspiracy, including, but not limited to FREDERICK SIMONE, FRANCIS WHITE, John DeMarco and Vincent Roberto and to dismantle the organization(s) in which they work. Other goals include: (1) identifying and prosecuting the gaming organization members who constitute SIMONE's targets; (2) identifying the individuals who are victims of SIMONE's criminal usury and extortion; (3) identifying and prosecuting the gaming, criminal usury and extortion organization members whom SIMONE pays in order to operate; (4) discovering where the proceeds of SIMONE's extortion, criminal usury and gaming operations have been spent, stored or invested, and seizing and seeking forfeiture of those proceeds pursuant to M.G.L. ch. 276, § 7; (5) determining the manner in which the persons in these organizations and/or conspiracies conduct their business and; (6) the location(s) used by the organization to store their records.

(First Affidavit, pp. 78-79). Russolillo explained how normal investigative procedures had been tried and had failed or would reasonably be unlikely to succeed in dismantling SIMONE's operation due to the nature of organized crime, including its use of counter-

surveillance, its close circle of trusted associates, and the fear it instilled in informants and others.

Defendants cannot argue that the goals of the investigation were overly broad merely because the law enforcement officers selected them. "Absent violation of [the law], the reviewing court cannot invade the province of the executive, whose function it is, within legal limits, to decide how to enforce the law. The Constitution empowers the judiciary to thwart the will of the other branches only when their behavior is not in accordance with law. Accordingly, selection of the targets and objectives of an investigation of a drug conspiracy is a law enforcement decision that is not appropriately made by the courts." United States v. Carrillo, 123 F. Supp. 2d 1223, 1250 (D. Colo. 2000), aff'd, 68 Fed. Appx. 918, 2003 WL 21465496 (10th Cir.), cert. denied, 540 U.S. 932 (2003). The electronic surveillance in this case was not sought to short-circuit an advancing investigation. Rather, the warrant was sought in order to attain the objectives of the investigation, namely, to identify the members of and to dismantle SIMONE's operation, and to provide competent, persuasive evidence against SIMONE, GIOACCHINI, WHITE, DeMarco, Roberto, and others subsequently named.

## 2. Normal Investigative Techniques.

Judge Botsford reasonably concluded, based on the First Affidavit's discussion of the difficulties of inter alia, undercover operations, surveillance limitations, the sophistication

43

of the targets, the targets' use of counter-surveillance techniques and the methods of communication, and the limitation of the CIs' knowledge and their demand for anonymity, that normal investigative procedures had failed or reasonably appeared likely to fail in this investigation. A review of the First Affidavit as a whole confirms the reasonableness of that finding.[23]

---

[23]Assuming, arguendo, as Defendants contend, that either or both Roberto and Dezotell were, in fact, sources who were willing to testify and provide information (that is, cooperating witnesses ("CWs")), and that their testimony would have resulted in SIMONE's conviction, the end result would not have been achievement of the Commonwealth's objective of dismantling SIMONE's faction of the LCN. Moreover, there has been no suggestion -- nor can there be -- that either Roberto or Dezotell even knew WHITE or DeMarco, for example, let alone were in a position to provide testimony against them. The limitations of Roberto's and Dezotell's perspectives and positions is exactly the same as it would be for virtually any CI. It is precisely these limitations that the Honorable Stephen Trott of the United States Court of Appeals for the Ninth Circuit fully discussed and rejected as a non-viable alternative to electronic surveillance in the case of a complex conspiracy. See, e.g., Canales Gomez, 358 F.3d at 1227. As he explained:

> We have stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy. ("[A]lthough the truthful testimony of accomplice witnesses will continue to be of great value to the law, rewarded criminals also represent a great threat to the mission of the criminal justice system."). This concept is true whether investigators are looking for drugs or weapons of mass destruction. On occasion, informants mislead investigators and prosecutors in order to feather their own nests. Indeed, juries in federal cases are routinely instructed that the testimony of witnesses receiving anything from the government in return for the witness's cooperation must be examined "with greater caution than that of other witnesses." Ninth Cir. Crim. Jury Instr. 4.9 (2003). There is not a trial lawyer alive who does not

44

a.   Search Warrants.

In the First Affidavit, Russolillo stated, "[i]t continues to be my opinion that executing a search warrant at any of the locations discussed herein (assuming probable cause existed to search those locations) would fail to result in the collection of sufficient evidence to identify, apprehend and prosecute all persons involved in this organization ... once FREDERICK SIMONE, FRANCIS WHITE, John DeMarco, Vincent Roberto and/or their associates learned of the execution of the search warrants, they would likely destroy records and other evidence, move their operations, and/or take additional measures to conceal their illegal activities from law enforcement" (p. 81).

b.   Confidential Informants.

The First Affidavit stated that the six CIs had conditioned their cooperation on anonymity (p. 80). Russolillo also noted that attempts to have the CIs penetrate SIMONE's faction of the LCN any further might pose a risk to their safety (p. 80). See Hoffman, 832 F.2d at 1307.[24]   In addition, Russolillo explained that

> understand that juries are wary of any witness
> receiving a benefit for testifying. Here, the
> government is to be commended for its interest
> in wiretap evidence, which, compared to the
> word of an informant either in the field or in
> court, is the gold standard when it comes to
> trustworthy evidence.

Canales Gomez, 358 F.3d at 1227 (citations omitted).

[24]The fear of SIMONE was legitimate.   Apart from his LCN status, he had just been released from prison, having served a lengthy sentence for the gangland killing of Angelo Patrizzi.

45

traditional investigative techniques had failed to permeate the secretive ways of organized crime both in the past and thus far in this investigation. Because of this, the limited information provided by a CI in this investigation would not have led to the dismantling of SIMONE's entire operation.

### c. Undercover Officer.

The use of an undercover officer was also not a practical means to achieve the goals of the investigation. Russolillo's First Affidavit informed Judge Botsford that:

> High-level members of illegal gaming organizations conduct business only with individuals they know and trust. It is therefore extremely difficult, if not impossible, for undercover officers or informants to successfully infiltrate the higher ranks of such organizations. Moreover, members of illegal gaming organizations attempt to keep close ties with public employees who know about, and will tell them about, efforts by law enforcement to penetrate the organization.

(First Affidavit p. 9).[25]

### d. Trash Analysis.

The First Affidavit related the limitations of trash analysis in organized crime cases:

> Trash analysis, though useful in some investigations would compromise this investigation for the following reasons: (1) I believe that the main target and

---

[25]The shortcomings of this investigative technique are particularly relevant here, because both SIMONE and GIOACCHINI were intimately familiar with the role of the FBI undercover agent in the investigation and prosecution of their LCN cohort, Biagio DiGiacomo.

46